695 N.E.2d 551 (1998)
296 Ill. App.3d 903
231 Ill.Dec. 34
In re A.J., a Minor (The People of the State of Illinois, Petitioner-Appellee,
v.
R.V., Respondent-Appellant).
No. 2-97-1038.
Appellate Court of Illinois, Second District.
May 27, 1998.
*553 Elliott A. Pinsel (Court-appointed), Daniels, Mauro & Pinsel, Waukegan, for R.V.
Michael J. Waller, Lake County State's Attorney, Waukegan, Martin P. Moltz, Deputy Director, Peggy F.J. Bradford, State's Attorneys Appellate Prosecutor, Elgin, for the People.
Justice BOWMAN delivered the opinion of the court:
Respondent, R.V., appeals the judgment of the circuit court of Lake County finding him an unfit parent and terminating his parental rights to his minor daughter, A.J. Respondent contends that (1) the court's finding that respondent failed to maintain a reasonable degree of interest, concern, or responsibility for the minor's welfare was against the manifest weight of the evidence; (2) the trial court's finding that respondent failed to make reasonable progress toward the return of the minor was against the manifest weight of the evidence; (3) the court erred in admitting and considering hearsay; and (4) the court erred in finding that it was in the minor's best interest that respondent's parental rights be terminated.
A.J. was born on February 29, 1992, with cocaine in her system. The court adjudicated the minor neglected on May 7, 1992. Respondent acknowledged paternity of A.J. on December 10, 1992.
On February 20, 1997, the State filed a petition to terminate respondent's parental rights, alleging that respondent was an unfit parent. During a two-day bench trial, the State's only witness was Terri Cummings, a caseworker from Central Baptist Family Services (CBFS), who testified regarding the various client service plans developed for respondent.
Cummings testified that, because respondent had not acknowledged paternity, the first case plan involved only the minor's mother, T.J., who is not a party to this appeal. The first case plan specifically involving respondent was prepared in January 1993. It called for respondent to obtain adequate housing, obtain a mental health assessment, obtain a drug and alcohol evaluation and follow its recommendations, submit to random urine tests, complete parenting classes, provide proof of income sufficient to support himself and the minor, and cooperate with caseworkers from CBFS and the Department of Children and Family Services (DCFS).
When that plan was evaluated in July 1993, respondent received an overall unsatisfactory rating. However, he received satisfactory ratings with regard to five of the seven specific tasks outlined in the plan, including obtaining a drug and alcohol assessment and following the recommendations, completing parenting classes, and showing proof of income. However, respondent had not completed a home study to determine whether his housing situation was adequate and had not received a mental health assessment. Respondent's visitations were rated satisfactory. The report appears to contain a satisfactory rating for submitting to random urine screens. However, the remarks at the bottom of the page state that drug screening was canceled because respondent was unavailable.
The minor's mother received a satisfactory rating, although she had not been heard from since June 25, 1993, and had not returned to drug treatment. Cummings testified that she was not the caseworker assigned to the case at that time.
Cummings testified that she prepared a court report in October 1993. At that time, respondent was not working on the assigned tasks and had not provided a drug test. Respondent told Cummings that he did not return from work until 5 p.m., at which time the agency that was to perform the tests was closed. Cummings said that "there were not a lot of other options" for drug testing at that time. Cummings characterized respondent as uncooperative in providing urine screens between 1992 and mid-1996.
In another court report dated December 1993, Cummings stated that respondent had *554 not been able to accomplish any of the assigned tasks. However, in the evaluation of the case plan on January 21, 1994, respondent's overall progress was rated satisfactory. Respondent was rated unsatisfactory for failing to submit to random urine screens, show proof of income, and obtain a psychological evaluation.
Respondent reported that he did not have an ongoing relationship with the minor's mother. At that time, T.J. had not been in contact with the caseworkers for more than a year. The goal of the service plan was the return of the child to respondent.
Despite his denials, respondent was referred to Al-Anon based on the belief that he had an ongoing relationship with T.J. According to Cummings, it was important for respondent to "address issues surrounding being in a relationship with a substance abuser."
Cummings prepared another court report on April 4, 1994. At that time, respondent had not been maintaining consistent contact with her. He had not obtained a psychological evaluation or been given a drug test. Cummings had asked respondent to call her on a day he was not working to see if a screen could be arranged for that day. Respondent did not call. Respondent did not provide proof of income or verify his attendance at Al-Anon meetings.
The minor was then living with a foster family. Respondent told Cummings that he saw A.J. every day, but the foster mother said this was not true. Respondent said that things between him and T.J. were "so so," but said that, if the child were returned to him, he would terminate his relationship with T.J.
On June 2, 1994, Cummings prepared another court report. By then, respondent had completed a parenting class but was not complying with random drug testing.
Cummings testified that respondent did have a drug screen on April 17, 1994, and that he tested positive for cocaine. Respondent objected on the basis of hearsay. The trial court stated that the evidence was inadmissible to prove the allegation in the State's petition that respondent was unfit by virtue of being a habitual drug user. The court further stated:
"The Court can weigh that evidence. It would not be treated as evidence that the drug screen was actually proven to be a positive drug screen or that it positively showed the presence of cannabis or cocaine. But to the extent that the workers testify as to the ACRs, the goals, and the work towards return home of the child, they may testify as to the information that they received and their conclusions from that."
Over objection, Cummings testified that respondent had another positive drug test on May 9 and canceled another on May 18. At that time, the recommended permanency goal was to return the child to respondent. At a court hearing on June 9, 1994, the court found that the plan and goal had not been achieved and that DCFS had abused its discretion in setting the goal of returning the minor to her parents. The court further found that to return home was not in the minor's best interests and ordered DCFS to reconsider its permanency goal.
Cummings and DCFS caseworker Ann Wells conducted a case review on July 25, 1994. At that time, the goal was still to return the child home. Respondent's overall progress was rated satisfactory although he had failed to submit to random urine screens or attend Al-Anon meetings. The handwritten comments show that respondent obtained a psychological evaluation and provided CBFS with the report. He submitted to two drug screens while reporting that his work schedule hindered his ability to submit to more tests. Respondent completed a parenting class and attended one Al-Anon meeting, although the plan called for weekly attendance. The report concludes, "[Respondent] has been cooperative on most recommendations with the exception of urine screens and Al-Anon."
Respondent was given numerous tasks to perform for the ensuing six-month period, including continuing to submit to random urine drops and attend Al-Anon meetings. Apparently T.J. had resurfaced and respondent and T.J. were directed to "assess their relationship; if they decide to remain a couple[,] *555 they will become involved in couples counseling."
During August 1994, respondent missed approximately three drug tests. Apparently, at a September 1994 court hearing, the judge again requested that DCFS consider abating its plan to have the minor returned home and ordered the agency to seek "preadoptive placement" of the minor.
Another court hearing was set for November 10, 1994. Since the previous hearing, respondent had completed three drug screens. Over objection, Cummings stated that two came back negative and one was positive. Respondent missed another scheduled test on October 31. He later stated that he had gone home and gone right to sleep.
During this time, respondent maintained that he was not involved in a relationship with T.J. Over respondent's hearsay objection, Cummings was permitted to testify that respondent's mother had said that they were "seeing each other and talking on the phone."
When a case review was conducted on December 16, 1994, the goal had been changed to long-term foster care. The report states that at the September 15 hearing, "the Judge stated she didn't feel it was feasable [sic] to have a return home goal. The Department would like to continue working with [respondent] as a return home option but realizes he has his issues to work on."
Respondent was rated unsatisfactory on the tasks of assessing his relationship with the minor's mother and attending couples counseling. Typewritten remarks state that respondent denied having a relationship with T.J. and felt that Al-Anon and relationship counseling were unnecessary. However, "there have been conflicting reports" from respondent's mother "that at times she has seen [T.J.] with" respondent.
Respondent was also rated unsatisfactory for being available for random drug tests and attending Al-Anon meetings. The typewritten remarks at the bottom of this page state, "[Respondent] has made himself available for random urine screens. Not all of [respondent's] urine screens have been negative and thus [A.J.] was unable to be returned to his custody."
Respondent was rated satisfactory on all other tasks. The report notes that he had been maintaining contact with the CBFS worker, had attended all meetings and court dates, and had been working full time at Motorola.
In a progress report prepared near the end of 1994, Cummings stated that respondent was complying with most tasks except for drug screening and Al-Anon meetings. The agency was still pursuing a goal of returning the minor to his care.
Cummings testified regarding respondent's failure to obtain drug tests during March and April 1995. At that time, she felt he was not cooperating with the service plans and that visitations were not "consistent." At a hearing on April 13, the court found it was in the minor's best interest that the permanency goal remain long-term foster care.
Respondent appeared at that hearing with cuts on his face. Cummings testified, over objection, that she had heard that T.J. had cut respondent during a fight and was then in the county jail as a result of that incident. A court report dated July 6, 1995, stated that respondent had had some negative urine screens.
The July 1995 case review rated respondent unsatisfactory for all tasks except attending meetings and court hearings related to his daughter and providing proof of income. The comments note that he had submitted to some drug screens but at other times was unavailable. Respondent's visitations were rated satisfactory.
In the case review of January 22, 1996, the goal had been changed back to returning the minor to respondent. Respondent was being allowed unsupervised visits with A.J. In this review, the tasks of respondent's assessing his relationship with T.J. and attending couples counseling were discontinued. The comments state, "[Respondent] and [T.J.] have not been involved as a couple." Respondent is rated satisfactory in all other areas. The report states:
"[Respondent] has been available for random urine screens as requested. [Respondent] has supplied verification of attendence [sic] at [Narcotics Anonymous] *556 meetings. [Respondent] has not tested positive for any substances.

* * *
[Respondent] has been maintaining contact with CBFS worker. [Respondent] has attended all meetings regarding [A.J.] [Respondent] has attended all court hearings and is cooperating with court orders. [Respondent] has not reported any status changes."
The report further states that respondent had been attending weekly, unsupervised visitations with A. J. Visitations lasted five hours except Christmas Eve, which was eight hours.
Cummings prepared a report for an April 30, 1996, court hearing. She stated that respondent failed to provide a urine drop on April 8. Respondent told her that he missed the appointment because he had to work late. However, he later stated that he had gone to a domestic violence class that night. According to Cummings, respondent missed another drug test on May 13.
At the State's request, the court took judicial notice that on June 13, 1996, the court ordered respondent's visitation with the minor suspended until he participated in an outpatient treatment program and remanded him to the Lake County jail for 28 days.
A July 9, 1996, case review rated respondent's progress unsatisfactory. The report states:
"[Respondent] continues to state that he is not involved in a relationship with [T.J.] and thus does not need to be involved in couples counseling, however, there have been allegations made that the two continue to see each [sic] (i.e. [A.J.] stating that [respondent] took her to see her mother).
* * *
[Respondent] failed to submit to a random urine screen on 4/8/96, [respondent] did submit to other urine screens. [Respondent] again tested positive and thus was court ordered to become involved in out patient substance abuse treatment. [Respondent] has not provided verification as to his receiving substance abuse treatment.
* * *
[Respondent] has been maintaining contact with CBFS worker. [Respondent] has not been maintaining contact with foster parents and thus is not fully aware of [A.J.'s] behaviors and feelings regarding the increased visitation. [Respondent] has been attending meetings regarding [A.J.]. [Respondent] has been attending court hearings, however, has not been complying with all court orders. [Respondent] has not notified CBFS of any changes in his status. [Respondent] has not provided recent income verification. [Respondent] is living with his parents and it is unknown if [A.J.] would be allowed to live there as well."
Cummings testified that in July 1996 the goal was changed back to long-term foster care. She stated that she ceased being the caseworker on the case after the July case review. On February 20, 1997, the State filed its petition to terminate respondent's parental rights.
At the close of the State's case, the trial court granted respondent's motion for a directed finding on several counts of the petition, including those alleging that respondent was habitually addicted to drugs and that he failed, for a period of 12 months, to communicate with the child or with the agency.
Respondent testified that he learned the child was his shortly after her birth. He initially denied that the child was his but later accepted his responsibility. He testified that he had not used illegal drugs for more than seven years. He specifically denied ingesting any cocaine from the time the case started to the time of trial. When asked why he failed to submit to random drug tests, he answered:
"Most of it was working late. Other times, missed the messages, stubbornness also. I was thinking that why do I have to go through this. Most of the time I was just pigheaded; just didn't want to go through it."
Respondent denied that he had a "physical" or "dating" relationship with the child's *557 mother. He testified that they sometimes met or called for "a brief moment."
The incident that resulted in T.J. being charged with aggravated battery started as a random visit to T.J.'s sister's house. It began as a friendly conversation and ended with respondent being cut with a razor blade. Although he did not feel it was necessary, respondent attended domestic violence counseling.
Respondent had attended Narcotics Anonymous or Alcoholics Anonymous meetings from 1995 until the time of trial. Since July 1996, he had been going two to three times per week.
Respondent worked at Motorola from 1991 until he was laid off in 1995. He later worked for a temporary employment agency. He often worked 10 hours per day Monday through Friday, and six hours per day on Saturday and Sunday.
The trial court found that respondent failed to maintain a reasonable degree of interest, concern, or responsibility for the minor's welfare and failed to make reasonable progress toward the goal of the return of the minor. After a separate hearing, the court determined that the minor's best interests would be served by terminating respondent's parental rights. The court denied respondent's posttrial motions and this timely appeal followed.
Respondent first contends that the court's finding that he failed to maintain a reasonable degree of interest, concern, or responsibility for the minor's welfare is against the manifest weight of the evidence. Because the termination of parental rights is an extraordinarily serious matter, the State must prove unfitness by clear and convincing evidence. In re S.J., 233 Ill.App.3d 88, 113, 174 Ill.Dec. 259, 598 N.E.2d 456 (1992). A trial court's finding of unfitness will not be reversed on appeal unless it is against the manifest weight of the evidence. In re V.O., 284 Ill.App.3d 686, 690, 220 Ill.Dec. 527, 673 N.E.2d 439 (1996).
The trial court did not explain its finding that respondent failed to maintain a reasonable degree of interest, concern, and responsibility for the minor's welfare except to state that respondent had "demonstrated some interest, varying degrees at varying times, some concern, relatively little responsibility towards the minor, some visitation, following some of the orders, not others."
These findings are, quite simply, not supported by the record. Except for one case review, occurring near the middle of the case, respondent always received satisfactory ratings for visitation. In 1996, he was having weekly, five-hour, unsupervised visitations with the minor until the trial court suspended visitation. Cummings testified that the visits had been going well before they were suspended. We cannot agree that this record can be dismissed as engaging in "some visitation" and that it fails to demonstrate a reasonable degree of interest in the minor's welfare.
Respondent generally received satisfactory ratings in the other areas that could be considered as most directly reflecting his interest, concern, and responsibility for the minor. He completed a parenting class. Except for one or two hearings prior to acknowledging paternity, respondent attended all court proceedings and administrative meetings relating to his daughter. Prior to the July 1996 case review, respondent had been consistently providing income verification and had received satisfactory ratings for obtaining housing.
The July 1996 case review rated respondent unsatisfactory for these tasks, noting that he had not provided a recent income verification. However, there is no evidence of a substantive change in his circumstances during this time. The only comment relative to his housing situation is that it was unclear whether A.J. would be allowed to live at his parents' house. However, there is no indication that she would not be able to, and because the State bears the burden of proving respondent an unfit parent, we cannot find that these isolated observations support the trial court's finding.
Moreover, we cannot accept the court's apparent rationale that any failure to comply with court orders or agency directives necessarily demonstrates a lack of interest or concern for the minor. We disapproved *558 of this type of "bootstrapping" in In re S.J., 233 Ill.App.3d at 120, 174 Ill.Dec. 259, 598 N.E.2d 456. As discussed more fully below, compliance with agency service plans is intended to be a means to an end, not an end in itself. S.J., 233 Ill.App.3d at 120, 174 Ill.Dec. 259, 598 N.E.2d 456. The statute includes a number of specific acts or conditions that may form the basis of a finding of parental unfitness. The State must prove conduct or conditions falling within one of these statutorily defined areas. To hold that the failure to comply with any agency directive constitutes evidence of a lack of interest or concern, and thus unfitness, would give the agency virtually unlimited discretion to terminate a party's parental rights for reasons unrelated to his or her fitness as a parent. The State failed to prove by clear and convincing evidence that respondent failed to maintain a reasonable degree of interest, concern, or responsibility for the minor's welfare.
This does not end our inquiry, however. The court also found respondent unfit on a second basis, failing to make reasonable progress toward the return of the minor. Respondent contests this finding as well. Because each statutory basis is an independent ground for a finding of unfitness, we must consider whether the evidence supports a finding of unfitness on this ground.
Respondent also objects to the use of hearsay in support of the allegations of the petition. Because these latter two issues are inherently interrelated, we consider them together.
"Reasonable progress" involves an objective judgment based upon progress measured from the conditions in existence when the minor was removed from the parents' custody and requires demonstrable movement toward the goal of reunification. In re L.N., 278 Ill.App.3d 46, 50, 214 Ill.Dec. 798, 662 N.E.2d 152 (1996); In re S.G., 216 Ill.App.3d 668, 669-70, 159 Ill.Dec. 125, 575 N.E.2d 932 (1991). Thus, evidence of the precise conditions at the time of the neglect adjudication is not essential to the determination of whether a parent has made reasonable progress. S.J., 233 Ill.App.3d at 119, 174 Ill.Dec. 259, 598 N.E.2d 456, citing In re L.L.S., 218 Ill.App.3d 444, 463-64, 160 Ill.Dec. 804, 577 N.E.2d 1375 (1991). The crucial consideration is the actual progress made. Nevertheless, even in this context, DCFS service plans ought to be directed to the parental deficiencies that led to the removal of the child. S.J., 233 Ill.App.3d at 120, 174 Ill.Dec. 259, 598 N.E.2d 456.
By definition, progress requires movement from some point to some other point. In other words, there must be a yardstick by which progress can be measured. While the yardstick need not necessarily be the condition which caused the child's removal in the first place, it must, as we held in S.J., bear some relationship to a parental shortcoming that would inhibit the return of the child to the parent. S.J., 233 Ill.App.3d at 120, 174 Ill.Dec. 259, 598 N.E.2d 456. The overarching difficulty with this case is that there has been no clear indication of what that parental shortcoming was or is.
The basis for the neglect proceeding was that the child was born with cocaine in her system. This clearly reflects drug usage by the mother, but not necessarily by the father. In finding respondent unfit, the trial court referred to his failure to cooperate in drug testing and attending Al Anon meetings and couples counseling. The State repeatedly emphasizes these facts in its brief. The missing ingredient is competent evidence that these tasks were necessary to facilitate respondent's ability to be a parent to his daughter.
As the State appears to concede, the caseworkers apparently assumed that because the child's mother was a drug user respondent was too. Certainly, the goal of providing a drug-free environment for the minor is laudable. Furthermore, such assumptions may be acceptable, and even necessary, in developing a service plan. However, they cannot substitute for admissible evidence at a trial on the issue of parental fitness.
The only competent evidence in the record relating to respondent's drug usage was his own testimony that he had not used cocaine or marijuana for more than seven years, a time well before the minor's birth. Obviously, *559 such testimony is self-serving and could properly be viewed with skepticism if there were any viable alternative. However, none of the properly admitted evidence establishes that respondent had a drug problem that would endanger the minor's welfare.
Early on in the case, respondent was directed to have a drug and alcohol evaluation and follow its recommendations. He was given a satisfactory rating for having done so. The results of the evaluation are not in the record. However, it is interesting to note that he was not referred for inpatient or outpatient drug treatment at that time. At some point while the case was open, respondent was directed to attend Narcotics Anonymous meetings and he did so with some regularity. This is not necessarily inconsistent with his testimony (by negative implication) that he had used drugs some years before. It was not until July 1996, four years after the case was opened, that respondent was ordered to undergo outpatient drug treatment. It is also noteworthy that the trial court entered a directed finding for respondent on the allegation that he was a habitual drug user. Respondent testified that he was "stubborn" about undergoing drug testing because he did not feel it was necessary.
Cummings did testify that approximately three of respondent's drug tests came back positive. However, respondent objected to this evidence on hearsay grounds. The trial court understood the hearsay problem and stated that it would not consider that evidence for the truth of the matter asserted. Thus, there was no evidence the trial court could properly consider that respondent had a problem with using illegal drugs while this case was open.
A similar situation obtains with regard to the requirements that respondent attend Al-Anon and "couples counseling." (While it is not identified in the record, we take judicial notice that Al-Anon is a support group for spouses, families, and friends of alcohol and drug abusers.) Cummings testified that these programs were necessary if respondent were having a relationship with T.J., an admitted drug abuser. However, with one arguable exception, respondent denied at all times that he was having such a relationship, and no competent evidence in the record contradicts this assertion.
Cummings based her conclusion that respondent was having a relationship with T.J. on various reports she received from third parties, including statements from respondent's mother that she had seen them together and talking on the phone, statements from the minor that respondent had taken her to see her mother, and statements from T.J. herself that she had battered respondent on one occasion.
We note that, even if true, these statements would not necessarily establish an ongoing relationship. They are entirely consistent with respondent's testimony that he had occasional social contact with T.J. but that they were not "dating." More importantly, however, these statements were hearsay. The trial court recognized this and stated that it would not consider them for the truth of the matter asserted.
We are left, then, with an order terminating respondent's parental rights to his daughter because he failed to follow agency recommendations which were not proved to be related to any parental shortcoming of respondent. This court extensively discussed the relationship between service plan tasks and defective parenting skills in In re S.J. Because that discussion is equally relevant to this case, we quote it at some length. We said:
"[C]ompliance with DCFS service plans is a means to a desired end, not the end in itself; thus, although we have held that the conditions imposed upon a parent whose child has been adjudicated neglected need not relate to the specific facts that led to the neglect adjudication [citation], even L.L.S. states that DCFS service plans ought to be directed, primarily at least, at the parental deficiencies that led to the initial removal of the child. (L.L.S., 218 Ill.App.3d at 465-66 [160 Ill.Dec. 804, 577 N.E.2d 1375]). A parent might succeed at reaching a goal envisioned by DCFS without following DCFS' specific directives. In this case, for instance, the weight of the evidence at the hearing was that [respondent mother] early succeeded in ceasing *560 her use of cocaine even though she was discharged from her initial therapy, did not obtain inpatient treatment as recommended, and enrolled in a program not recommended by her original counselor. To hold that her failure to comply with the specifics of the service plans in this regard is probative of her lack of reasonable progress would unfairly and irrationally elevate administrative means over statutory ends.
Second, to place undue emphasis on compliance with service plans would raise the danger of a form of `bootstrapping' under which a parent could lose her rights to her children because she failed to do things that were not necessarily related to her previously established shortcomings as a parent." S.J., 233 Ill.App.3d at 120, 174 Ill.Dec. 259, 598 N.E.2d 456.
This case presents the type of bootstrapping of which S.J. disapproved. The State utterly failed to establishat least by competent evidencethat respondent had a drug problem that hindered his ability to raise his child or that he was having a destructive relationship with the child's mother that required him to undergo counseling. The only reason for terminating respondent's parental rights was his failure to comply with administrative directives that had nothing to do with his ability as a parent.
The State does not, and cannot, argue that merely undergoing drug testing necessarily makes one a better parent. The statute imposes no such requirement. Similarly, requiring a bachelor who is not involved in an ongoing relationship to undergo counseling designed for couples with substance abuse problems is absurd.
The only basis for requiring respondent to complete these tasks was hearsay information that respondent had had positive drug tests and was maintaining a relationship with T.J. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. People v. Rodriguez, 291 Ill.App.3d 55, 60, 225 Ill.Dec. 653, 684 N.E.2d 128 (1997). Unless hearsay falls within a recognized exception, it is inadmissible. Rodriguez, 291 Ill.App.3d at 60, 225 Ill.Dec. 653, 684 N.E.2d 128.
The trial court stated that it was not considering the hearsay for the truth of the matter asserted but would permit the caseworkers to testify "as to the information that they received and their conclusions from that." As detailed above, however, without accepting the hearsay for the truth of the matter asserted, there is absolutely no basis for concluding that the tasks required in the service plans were necessary or appropriate. Respondent may not be found unfit merely because he failed to follow the specific directives of a service plan unless the State can establish that those directives relate to some perceived shortcoming. Here, the State made the requisite showing, if at all, through inadmissible hearsay.
This case demonstrates clearly why hearsay is inadmissible. The source of the information regarding respondent's drug tests is unknown. We do not know whether Cummings received reports directly from the laboratory conducting the tests or merely heard from someone elseperhaps someone with a motive to liethat respondent had failed a drug test. No information is available about the procedures used in testing, the substances involved, or the amounts in question. Respondent was unable to cross-examine witnesses about the testing procedures.
Similarly, Cummings required respondent to undergo relationship counseling on the basis of hearsay statements that he was dating the child's mother. As noted, all the statements cited by Cummings are inherently ambiguous, subject to more than one interpretation. In no way could respondent cross-examine the sources of these statements to determine precisely what they saw and whether they accurately reported it.
The State does not respond directly to respondent's argument that the court relied on improper hearsay. The State instead suggests, under the guise of responding to the hearsay argument, that "respondent has failed to raise even a scintilla of evidence as to why he is a fit person to be a parent." Of course, the State has the burden to prove that respondent is an unfit parent. S.J., 233 Ill.App.3d at 113, 174 Ill.Dec. 259, 598 N.E.2d *561 456. The State may not excuse its failure to present admissible evidence by shifting the blame to respondent.
The State also suggests that any error was harmless, contending that the properly admitted evidence established respondent's unfitness. However, in recounting the "proper" evidence, the State repeatedly refers to the fact that respondent failed drug testsprecisely the evidence to which respondent objects. It is disingenuous at best to argue that the error in admitting evidence is harmless because the erroneously admitted evidence proves the proposition for which it was introduced.
Parenthetically, we note that, even if the evidence of positive drug tests is taken at face value, this would not necessarily establish respondent's unfitness. In S.J., we rejected the notion that evidence of sporadic drug use conclusively rendered a parent unfit, stating:
"To uphold the trial court's finding of no `reasonable efforts' would effectively allow the court to terminate [the mother's] parental rights because she had smoked marijuana after the birth of her child. We recognize that marijuana is a controlled substance and do not intend to condone its possession or use. However, we do not believe that [the mother's] conduct relating to the use or possession of marijuana in the case before us should suffice as a basis for judicial action as sweeping and devastating as the termination of a parent's rights in her child. In any event, the statute cannot fairly be read to allow such a result, at least under the facts of this case." S.J., 233 Ill.App.3d at 118, 174 Ill.Dec. 259, 598 N.E.2d 456.
In S.J., as in this case, the minor was born with cocaine in her system. Unlike in this case, the respondent was the mother, an admitted drug user. Nevertheless, isolated incidents of drug use (proved by competentor at least unobjected toevidence) were an insufficient basis, without more, to terminate respondent's parental rights.
We emphasize that cocaine and marijuana are illegal drugs. Criminal statutes provide penalties for their use, but these do not include the loss of one's child. In this case, the trial court rejected the State's allegation that respondent was a habitual drug user. In light of the circumstances of A.J.'s birth, we do not denigrate the importance of the goal of providing a relatively drug-free environment for her. We hold only that the State failed to prove that respondent was failing to do this.
The cases the State cites in support of its contention that the evidence was sufficient are readily distinguishable. All involve conduct far more egregious than that established here. Because of our resolution of this case, it is unnecessary to consider respondent's final contention.
The judgment of the circuit court of Lake County is reversed.
Reversed.
RATHJE and HUTCHINSON, JJ., concur.