749 N.E.2d 1033 (2001)
322 Ill. App.3d 486
255 Ill.Dec. 551
In re F.S., a Minor, Respondent-Appellee (The People of the State of Illinois, Petitioner-Appellee,
v.
S.K., Respondent-Appellant).
No. 1-99-2570.
Appellate Court of Illinois, First District, First Division.
May 14, 2001.
*1034 Rita A. Fry, Public Defender of Cook County (Elyse Krug Miller, of counsel), Chicago, for Appellant.
Richard A. Devine, State's Attorney of Cook County (Renee Goldfarb, Nancy Grauer Kisicki, and Mary P. Needham, of counsel), Chicago, for Appellee.
Presiding Justice McNULTY delivered the opinion of the court:
The trial court found that the State proved, by clear and convincing evidence, that S.K. was an unfit parent for F.S. S.K. appeals from the order terminating her parental rights over F.S.
S.K. gave birth to F.S. on March 17, 1996. The trial court gave the Department of Children and Family Services (DCFS) temporary custody of F.S. on April 11, 1997. On August 11, 1997, the *1035 court entered its adjudication order finding F.S. neglected. The State petitioned for termination of S.K.'s parental rights in November 1998, alleging that she failed to maintain a reasonable interest in F.S.'s welfare, and she failed to make reasonable progress towards return of the child within nine months of the adjudication of neglect. The State also charged S.K. with drug addiction, but withdrew the charge before trial in light of evidence that she had overcome her addiction.
Following trial, the court entered findings against S.K. on both charges and terminated her parental rights. Using the powers granted by section 2-29(2) of the Juvenile Court Act of 1987 (705 ILCS 405/2-29(2) (West 1998)), the court appointed a guardian with power to consent to F.S.'s adoption. The public defender representing S.K. filed a timely notice of appeal on July 21, 1999.
We allowed the public defender two unopposed extensions of time for filing the record on appeal. In February 2000 the public defender requested, over the State's objection, a five-month extension of time for filing the appellant's brief. We granted only half of the requested extension, setting a filing date of May 8, 2000. We later granted the public defender's unopposed motion for an extension of seven more weeks. We also granted the public guardian and the State three extensions of time for filing appellees' briefs on appeal. The parties finished briefing the case on February 28, 2001, almost 20 months after the court terminated S.K.'s rights over her child.
Our supreme court, in In re D.L., 191 Ill.2d 1, 10, 245 Ill.Dec. 256, 727 N.E.2d 990 (2000), held that for a charge of failure to make reasonable progress towards thereturn of a child, only evidence concerning the parent's conduct in the nine months following the neglect adjudication is admissible. See 750 ILCS 5 0/1(D)(m) (West 1998). Due to the differences between the evidence admissible on the two charges, we will recount the facts separately for the separate charges.
But for both charges, we bear in mind the fundamental purposes of proceedings under the Juvenile Court Act. Our supreme court has recently clarified that we should consider statutory statements of purpose in applying statutes, even if the statutes are not ambiguous. Primeco Personal Communications, L.P. v. Illinois Commerce Comm'n, 196 Ill.2d 70, 86-88, 255 Ill.Dec. 621, 750 N.E.2d 202 (2001). The Juvenile Court Act states that its purposes include:
"secur[ing] for each minor subject hereto such care and guidance, preferably in his or her own home, as will serve the safety and moral, emotional, mental, and physical welfare of the minor and the best interests of the community; [and] preserving] and strengthen[ing] the minor's family ties whenever possible, removing him or her from the custody of his or her parents only when his or her safety or welfare or the protection of the public cannot be adequately safeguarded without removal." 705 ILCS 405/1-2(1) (West 1998).
The statutory scheme of the Juvenile Court Act and the Adoption Act (750 ILCS 50/0.01 et seq. (West 1998)) "evinces twin policies favoring the superior rights of natural parents to the custody of their children and of fostering greater stability in the home environment." In re Custody of Menconi, 117 Ill.App.3d 394, 398, 73 Ill. Dec. 10, 453 N.E.2d 835 (1983).
Because the termination of parental rights is a drastic action which deprives a parent of rights that are "fundamental and as ancient as mankind" (In re Custody of Townsend, 86 Ill.2d 502, 509, 56 *1036 Ill.Dec. 685, 427 N.E.2d 1231 (1981)), the statutory scheme requires proof of unfitness by clear and convincing evidence. In re A.J., 296 Ill.App.3d 903, 913, 231 Ill.Dec. 34, 695 N.E.2d 551 (1998). We review the facts in such cases with careful scrutiny, but we will not reverse the trial court's findings on factual issues unless the findings are contrary to the manifest weight of the evidence. In re M.W., 199 Ill.App.3d 1050, 1052-53, 146 Ill.Dec. 17, 557 N.E.2d 959 (1990).

I
The trial court placed F.S. in the temporary custody of DCFS based on findings that S.K. had a filthy home, a history of inadequate supervision and food, and a drug habit. The court made no new findings upon entering the adjudication order dated August 11, 1997.
S.K. was in jail on that date. DCFS had established a service plan requiring S.K. to attend parenting skills classes and to undergo treatment for drug addiction and a psychological evaluation. S.K. had requested visitation with F.S., and she had all visits DCFS permitted her in jail. She successfully completed a parenting skills class in jail shortly after the court entered the adjudication order. She also participated in the jail's program for treating drug addiction.
S.K. visited F.S. shortly after her release from jail in October 1997. The caseworker who supervised the visit noted that S.K. and F.S. "interacted appropriately. [S.K.] was very happy and loving. Child was happy and appeared to have a relationship [with] natural family."
But despite the many drug treatment programs S.K. had tried, including the one in jail, she used cocaine again shortly after her release from jail. She did not pursue DCFS services, and she did not see her child, for the following four months. In February 1998 she began a drug treatment program at Chicago Victory Church (CVC).
None of the drug counselors at CVC had professional education in treating drug addiction. All of the counselors had been drug addicts who tried treatment programs run by professionals, and those programs failed to alleviate their drug dependencies. The counselors had recovered from addiction through CVC's program instead. The counselors used the Bible to teach Christian values. For the first nine months after an addict entered the program, counselors supervised the addict 24 hours a day. A staff member accompanied the addict even when the addict opened mail or went to the bathroom. If the addict completed the first phase successfully, CVC worked with her through a second phase of helping her adjust to a more normal life.
CVC sent DCFS letters detailing S.K.'s progress in the program, and CVC invited DCFS to contact CVC for any further information DCFS might need. DCFS never requested any information. Although S.K. invited a caseworker to visit CVC, the caseworker did not do so.
By May 11, 1998, nine months after the court entered the adjudication order, S.K. had been drug-free for almost three months. One caseworker reported that S.K. had missed no visits with F.S. after February 1998.
All caseworkers agreed that S.K. interacted appropriately with F.S. in all visits. But one caseworker's report from June 1998 rated S.K.'s progress as unsatisfactory, because she took parenting classes in jail, not through DCFS, she had drug treatment from CVC, not a program recommended by DCFS, and she had not had the psychological evaluation mentioned in the service plan. The caseworker also *1037 claimed that S.K. visited F.S. only once between October 1997 and June 1998. The caseworker did not testify at trial and no document explained the discrepancy with the visitation information in the other caseworker's report.
The pastor of CVC testified that 25% of the addicts who came to CVC successfully recovered from addiction, and that rate surpassed the success rate of the programs DCFS approved. CVC had appropriate facilities for families of members who reached the second phase of recovery, as well as for church ministers.
In summarizing the evidence, the judge emphasized that from mid-October 1997 until late February 1998, S.K. failed to contact DCFS. She did not begin treatment for her drug addiction until February 1998, and the program she entered had no professionals on staff. S.K. completed the first phase of CVC's program more than nine months after the adjudication order. The judge commended S.K. for changing her life and freeing herself from drug dependency, and continued:
"The Court also acknowledges the succes[s] of [CVC] in helping turn people's lives around to become productive members of society, but the fact remains that this program is not staffed by licensed professionals with any professional training to treat others. It is not an acceptable service provider for DCFS * * * and does not meet the requirements in the service plan.
The evidence has shown that there are no educational or training requirements for staff members * * *.
It * * * certainly has had many successes, but it does not qualify as a treatment program. * * * [S.K.] got repeated referrals for inpatient and outpatient drug treatment programs which were approved by DCFS * * * [and] she in fact refused * * * all such referrals * * *."
After noting again that CVC "is not a licensed program approved by the State agencies," the judge held that S.K. failed to make reasonable efforts to correct the conditions that led to removal of F.S. from her home, and she failed to make reasonable progress towards return of F.S.
Under the Juvenile Court Act and the Adoption Act, a parent may be found unfit if the State presents clear and convincing evidence of:
"Failure by a parent to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent, or to make reasonable progress toward the return of the child to the parent within 9 months after an adjudication of neglected or abused minor * * *. If a service plan has been established * * * to correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of this Act, `failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care within 9 months after the adjudication * * *." 750 ILCS 5 0/1(D)(m) (West 1998).
This section of the statute establishes two separate criteria for finding a parent unfit. In re S.J., 233 Ill.App.3d 88, 117, 174 Ill.Dec. 259, 598 N.E.2d 456 (1992). To determine whether a parent has made reasonable efforts to correct the conditions that led to the child's removal, the court must consider the kind of effort that would be reasonable for the particular parent from that parent's point of view. In re K.P., 305 Ill.App.3d 175, 180, 238 *1038 Ill.Dec. 375, 711 N.E.2d 478 (1999). The determination of reasonable progress, on the other hand, involves an evaluation of progress measured against the conditions that led to the child's removal (A.J., 296 Ill.App.3d at 913, 231 Ill.Dec. 34, 695 N.E.2d 551), or any conditions newly arising which might warrant continuing custody of the child in DCFS (see In re C.S., 294 Ill.App.3d 780, 789-90, 229 Ill.Dec. 225, 691 N.E.2d 161 (1998)).
Two conditions led to removal of F.S. from S.K.'s care: drug abuse, and poor parenting skills evidenced by a filthy home and allegations of inadequate supervision and food. The State presented no evidence of any new grounds for preventing family reunification. S.K. successfully completed parenting classes in jail shortly after the adjudication of neglect. The State presented no evidence concerning S.K.'s parenting skills or the cleanliness of her home at the end of the relevant time period. The evidence cannot support a finding that S.K. failed to make reasonable efforts and reasonable progress towards correcting her deficient parenting skills.
S.K. also participated in treatment for her drug addiction in jail, but that treatment had no beneficial effect. When the jail released her, S.K. quickly returned to drug dependency. Although she rejected other programs DCFS recommended, she found, on her own, a program that actually helped her. She committed herself to the intense regimen CVC imposed for treatment of her drug and alcohol addictions. By the end of the relevant time period, S.K. had ingested no drugs or alcohol for almost three months. While she could not claim a complete cure at that point, she had made reasonable efforts, and she had achieved reasonable progress, towards curing her drug and alcohol addictions.
In finding to the contrary, the trial court relied primarily on CVC's lack of licensed professionals on staff and the lack of DCFS approval for the program. But DCFS employees turned down an invitation to visit CVC, and DCFS made no response to CVC's offer of further information DCFS might need about its program or S.K.'s progress. DCFS and the State presented no evidence to contradict testimony that CVC achieved a success rate of 25%, and that the success rate exceeded that of the programs DCFS approved.
The Adoption Act specifies that insofar as a DCFS service plan is designed to correct the conditions that led to removal of a child, the parent's failure to substantially fulfill obligations under the service plan can show a failure to make reasonable progress to return of the child. 750 ILCS 5 0/1(D)(m) (West 1998). But in assessing substantial fulfillment of the parent's obligations, the court must "recognizee] that compliance with DCFS service plans is a means to a desired end, not the end in itself * * *. A parent might succeed at reaching a goal envisioned by DCFS without following DCFS' specific directives." In re S.J., 233 Ill.App.3d 88, 120, 174 Ill.Dec. 259, 598 N.E.2d 456 (1992).
In S.J., as here, the parent found better therapy for drug dependency in a program DCFS did not recommend. The court said: "To hold that her failure to comply with the specifics of the service plans in this regard is probative of her lack of reasonable progress would unfairly and irrationally elevate administrative means over statutory ends." S.J., 233 Ill.App.3d at 120, 174 Ill.Dec. 259, 598 N.E.2d 456; see A.J., 296 Ill.App.3d at 916, 231 Ill.Dec. 34, 695 N.E.2d 551. Requiring specific compliance with the service plan would also contravene the explicit statutory purpose of preserving and strengthening family ties whenever possible. 705 ILCS *1039 405/1-2(1) (West 1998). The court in S.J. clarified that the failure to comply with a service plan remained relevant, but such failure alone could not overcome evidence of reasonable progress toward correction of the conditions that led to removal of the child. S.J., 233 Ill.App.3d at 121, 174 Ill. Dec. 259, 598 N.E.2d 456; see also A.J., 296 Ill.App.3d at 916, 231 Ill.Dec. 34, 695 N.E.2d 551 (where the State presented no evidence that a parent had drug problems affecting the ability to raise children, the parent's failure to attend drug counseling was not grounds for terminating parental rights, although the service plan required drug counseling).
The trial court here accepted the uncontradicted evidence of reasonable progress towards curing the drug addiction and commended S.K. in open court for her efforts. Although S.K. missed scheduled appointments with licensed psychologists for the evaluation required by the service plan, that requirement related remotely at best to the conditions that led to removal of the child. S.K. made reasonable efforts and achieved reasonable progress toward correcting the deficient parenting skills and the drug and alcohol dependencies that led to removal of F.S. from her home. The fact that she made her progress and met her obligations outside of DCFS programs cannot show that she failed to make progress or that she failed to substantially fulfill her obligations under the service plan. The lack of DCFS approval of CVC has particularly little probative value here, because the caseworker turned down an invitation to visit CVC and DCFS never requested further information about CVC. We cannot say that the State proved, by clear and convincing evidence, that S.K. failed to make reasonable efforts and reasonable progress towards correction of conditions that led to removal of F.S. within nine months of the neglect adjudication. The trial court's finding against S.K. on this issue is contrary to the manifest weight of the evidence.

II
The trial court also found that the State proved, by clear and convincing evidence, that S.K. failed to maintain a reasonable degree of interest, concern or responsibility as to F.S.'s welfare. For this issue the court, over S.K.'s objection, admitted evidence from the years before F.S.'s birth.
As a teenager, S.K. began using drugs and she attempted suicide. A psychiatrist diagnosed her condition as bipolar disorder and borderline schizophrenia resulting from drug abuse. Professionals treated her drug dependency repeatedly, and she even completed one program for recovery from drug addiction. Still, she remained addicted.
S.K. gave birth to her first child in 1987 and to her second in 1989. In November 1994, more than a year before the birth of F.S., a DCFS investigator responded to a report that S.K. did not provide her children adequate food. The investigator found adequate food for the children, and S.K.'s mother supervised them appropriately. Because the investigator found no signs of abuse or neglect, he left the children in S.K.'s home.
Another DCFS investigator went to S.K.'s home in April 1996, one month after F.S.'s birth. S.K. had been in an approved drug treatment program run by professionals, but she relapsed to drug usage when she left on a pass. The investigator found S.K.'s home "clean and appropriate," and she concluded that S.K.'s mother adequately supervised the children. Again, the children showed no signs of abuse or neglect. The investigator especially noted that F.S. was "clean and very well taken care of." Again, DCFS left the children in their home.
*1040 In February 1997 DCFS received a report that S.K.'s mother had begun using illegal narcotics. A new investigator wrote that the residence was
"dirty, cluttered & disorganized. Clothing was piled appr. 1½2 feet high in living room corner. The floors & walls are very dirty. There is crumbs, food & dirt on all floors. * * * [M]attresses [are] filthy w/no bedding."
She also reported that S.K. said her mother used drugs in the home. But even that investigator noted that the children showed no signs of abuse; they were clean, healthy, and had grown to appropriate heights and weights.
Another caseworker who saw the family at the same time reported:
"[S.K.] does care about her children and does want the best for them. She has had moments when she was clean from drugs that she seemed affectionate and caring towards her children."
That caseworker agreed that the use of drugs by S.K. and her mother placed the children at risk of harm. DCFS took custody of the children, including F.S., and the court later granted DCFS temporary custody. The caseworkers who saw the family in February 1997 did not testify at trial, and the person who reported the family to DCFS did not testify either. The court heard no evidence of when S.K.'s mother began using drugs or for how long the home was unacceptably filthy.
S.K. did not attempt to contact F.S. for two months after DCFS took custody. In April 1997 she went to jail for a drug offense. She requested visits with F.S., and a caseworker brought the child to the jail for the visits. The caseworker later marked S.K.'s progress as unsatisfactory because she did not have parenting classes and drug treatment through DCFS. S.K. told the caseworker that she had both the classes and the treatment through the jail, but the caseworker testified that he discounted that statement because he received no confirming documentation. He did not ask either the jail or S.K. for documentation, and he made no other effort to get the documents. On redirect the caseworker explained he rated S.K.'s progress unsatisfactory based on her failure to use DCFS services before she went to jail.
The jail sent a certificate showing that S.K. successfully completed the parenting classes. CVC sent DCFS documentation of S.K.'s successful participation in drug treatment.
By July 1998, S.K. had earned a position as a counselor in CVC's program. As her rehabilitation continued, CVC asked her to take on more responsibilities. She became director of the youth ministry and the director of the women's home. CVC's pastor testified that S.K. interacted very well with the children. For the women's home, S.K. was responsible for meeting the basic needs of the recovering addicts, by keeping track of doctor's appointments, and keeping sufficient food available, amongst other duties. She also enforced CVC's rules for addicts in the home. CVC asked S.K. to handle the money from church fund-raising events.
In October 1998 S.K. finally had the psychological evaluation DCFS required. The psychologist wrote that S.K.'s greatest worry was that she might not get her baby back. According to the psychologist:
"[S.K.] has clearly refocused her life * * *. * * * [S]he has a new strongly moralistic outlook on life, and at this time, has immersed herself in this spiritual training. [S.K's] responses to [psychological tests included] positive statements of self-esteem, of accepting her past, and of moving on to a better and more productive life. She was able to *1041 admit to her mistakes in the past * * *."
S.K. told the psychologist she intended to continue living at the church, with the goal of becoming a church minister. She hoped to live with F.S. in CVC's family facilities. The psychologist "strongly advised" DCFS to visit CVC to determine "whether this is a viable future for [S.K.], and an appropriate environment for her daughter." Also, the psychologist suggested that S.K. would benefit from professional treatment of her psychological issues.
The new caseworker for S.K. reported in November 1998 that S.K. made "great progress" since joining CVC. She noted that random urine drops confirmed that S.K. was drug-free. Neither the caseworker nor anyone else from DCFS followed the psychologist's advice to visit CVC.
On the State's examination S.K. admitted to her past drug abuse and her failures at several treatment programs. She admitted that she did not pursue DCFS services and she did not see her child for several months from October 1997 through February 1998. When the prosecutor asked, "Isn't it true that you neglected your children because of drug use?," S.K. answered:
"I left my children in proper care. I never neglected my children. They were always left with someone."
But she admitted that because of her addiction she mostly left her children in her mother's care.
S.K. told the court that she intended to become a minister for CVC and to continue living in CVC facilities. She had some earnings from her fund-raising work, and she was to begin receiving a regular salary in September 1999.
The judge recounted the evidence at length, and found:
"[S.K.] denies any responsibility for having neglected her children. She considers that her care plan for her children was at all times appropriate, even though * * * her care plan consisted of leaving the children with the grandmother knowing grandmother was using drugs. * * * I find that's not a responsible parental position."
The judge found that S.K. visited her child only once between October 1997 and June 1998, and concluded that S.K. failed to maintain a reasonable degree of interest, concern or responsibility as to F.S.
Our supreme court has established the applicable principles for our review:
"[I]n determining whether a parent showed reasonable concern, interest or responsibility as to a child's welfare, we have to examine the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred. Circumstances that warrant consideration when deciding whether a parent's failure to personally visit his or her child establishes a lack of reasonable interest, concern or responsibility as to the child's welfare include * * * whether the parent's failure to visit the child was motivated by a need to cope with other aspects of his or her life or by true indifference to, and lack of concern for, the child [citation]. * * *
* * * [T]he issue is whether a parent maintained concern, interest and responsibility as to his or her child's welfare that, under the circumstances, was of a reasonable degree. To terminate a particular parent's parental rights, a court must find the negative of the propositionit must find that there is clear and convincing evidence that such a level of reasonable interest and concern was not maintained." (Emphasis omitted.) In re Adoption of Syck, 138 Ill.2d 255, 278-80, *1042 149 Ill.Dec. 710, 562 N.E.2d 174 (1990).
First, we note that the trial court had no basis for finding clear and convincing evidence that S.K. missed any visits after February 1998. At best the court had contradictory reports, from different caseworkers for the same agency. Neither caseworker testified, and neither document explained the discrepancy. The documents give the court no grounds for finding one more credible than the other. See M.W., 199 Ill.App.3d at 1054-55, 146 Ill.Dec. 17, 557 N.E.2d 959 (conflicting, inconclusive testimony insufficient to support finding of sexual abuse).
Still, S.K. missed scheduled visits with F.S. in February and March of 1997, and from October 1997 through February 1998. In the longer gap, S.K. finally found a way to deal effectively with the drug addiction which had led to loss of custody of F.S. She had tried numerous treatment programs run by licensed professionals, even successfully completing one, and none had helped her. Without help from DCFS, she found a more restrictive program, run by people who actually recovered from drug addictions, and she committed herself to finally defeating the addiction with their help.
Our supreme court in Syck said that coping with personal problems might explain a lack of visits in some circumstances. We believe that this case presents circumstances that explain some missed visits. The case also presents evidence that S.K. initiated visits with her child, and she always interacted appropriately, with care for her child, whenever DCFS permitted her to visit. The missed visits, alone, do not constitute clear and convincing evidence of a lack of concern for F.S.
The trial court found that S.K. showed a lack of responsibility because she left her children in her mother's care. But DCFS investigated the home repeatedly and repeatedly found that S.K.'s mother cared for the children appropriately and maintained a clean, healthy home. In February 1997 an investigator found the home filthy and reported that S.K. said her mother was using drugs. Despite the psychologist's report that S.K. had taken responsibility for such past mistakes, the court castigated S.K. for her defensive response in court to the prosecutor's provocative question. Because the investigators repeatedly found that S.K.'s mother provided good care for her grandchildren, S.K.'s reliance on her mother does not show a lack of concern or responsibility for F.S. Especially when the evidence is viewed in light of the statutory purpose of maintaining and strengthening family ties whenever possible, we cannot find clear and convincing evidence that S.K. failed to maintain a reasonable level of interest, concern or responsibility as to the welfare of F.S.
For many years S.K. suffered from drug addiction, trying one treatment program after another and finding no relief. Yet with her mother's help she managed to keep her children in a clean, healthy home, until her mother also began using illegal narcotics. Once DCFS took her child and she began serving a jail sentence, S.K. began the long process of recovery. She took parenting skills classes in jail, and she had further unsuccessful treatment for her addiction. A few months after she left the jail, she found a treatment program that could help her recover. Her desire for reuniting with her baby led her to commit herself to overcoming her addiction. And she succeeded remarkably well, abstaining from drugs and alcohol and confronting increasing responsibilities for herself and others.
*1043 DCFS met S.K.'s remarkable effort with a petition to terminate her parental rights, filed after S.K. had already made substantial progress. DCFS presented evidence that S.K. did not directly comply with the service plan, in that she achieved the goals of the service plan through programs DCFS had not recommended. Despite S.K.'s invitation, CVC's offer, and the advice of the psychologist DCFS appointed, DCFS neither visited CVC nor requested any further information on its programs.
The trial court found that because the CVC program lacked professional staff and it did not obtain approval from DCFS, it did not qualify as a treatment program, and S.K.'s fulfillment of the goals of the service plan through the CVC program did not count as substantial fulfillment of her obligations under the service plan. The trial court granted DCFS the order it sought.
Within nine months of the adjudication order, S.K. completed parenting classes and entered drug treatment which kept her off drugs for several months. The trial court's finding of clear and convincing evidence of a lack of reasonable effort and reasonable progress is contrary to the manifest weight of the evidence. S.K. visited F.S. most of the times DCFS allowed, except for the months when she finally turned her life around by finding an appropriate, helpful treatment for her addiction. She always interacted well with her child. Apart from a possibly brief time in which S.K.'s mother succumbed to drugs, S.K. and her mother managed to maintain an appropriate environment for S.K.'s children. The trial court's finding of clear and convincing evidence that S.K. failed to maintain a reasonable degree of interest, concern or responsibility for F.S. is contrary to the manifest weight of the evidence. The finding of unfitness must be reversed.
Reversed.
FROSSARD and COHEN, JJ., concur.