**NOTICE**

Decision filed 11/28/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 230497-U

NOS. 5-23-0497, 5-23-0498, 5-23-0499 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

**NOTICE**

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* G.J., D.H., and R.H., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Edgar County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 20-JA-10, 20-JA-11, 20-JA-12 |
| | ) | |
| A.H., | ) | Honorable |
| | ) | Matthew L. Sullivan, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Presiding Justice Boie and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1     *Held*: The circuit court's fitness determination was not against the manifest weight of the evidence. The lack of factual findings by the circuit court precluded review of whether it was in the children's best interest to terminate Mother's parental rights and the trial court's order is reversed where the trial court failed to consider the relevant statutory factors.

¶ 2     The respondent, A.H. (Mother), appeals from the circuit court's January 19, 2023, decision to terminate her parental rights and the June 27, 2023, order denying her motion to reconsider. For the reasons set forth below, we reverse and remand this cause for further proceedings.

¶ 3                                          I. BACKGROUND

¶ 4     Mother is the biological mother of G.J., born on July 13, 2015, D.H., born on December 20, 2017, and R.H., born on June 16, 2020. Mother was reported to the Illinois Department of

Children and Family Services (DCFS) because Mother and R.H. tested positive for methamphetamine at R.H.'s birth. Due to Mother's methamphetamine use, the three children were taken into DCFS custody.

¶ 5 On June 19, 2020, the State filed juvenile petitions for G.J., D.H., and R.H. pursuant to the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1) (West 2018)) based on neglect due to an injurious environment. The petition filed for R.H. alleged that Mother had repeatedly used methamphetamines and R.H. tested positive for methamphetamines on June 16, 2020, his date of birth. The petitions filed for G.J. and D.H. were substantially similar. Both petitions included neglect allegations that Mother repeatedly used methamphetamines, their sibling, R.H., testing positive for methamphetamines at birth, and Mother had left the children unsupervised at times.

¶ 6 DCFS created a Family Service Plan on July 22, 2020, with the goal of having the children return home within 12 months. The service plan required that Mother complete an integrated assessment (IA), engage in substance abuse treatment, and demonstrate progress with that treatment. After Mother completed the IA, her service plan was updated to include individual psychotherapy, and domestic violence education, as well as substance abuse treatment.

¶ 7 Mother successfully completed substance abuse treatment in October of 2020, through the Human Resource Center (HRC) in Paris, Illinois. Random drug screens remained as a service requirement to monitor Mother's sobriety.

¶ 8 Mother admitted to the allegations in the juvenile petitions, and an order of adjudication was entered on March 4, 2021. Approximately one month after the adjudication order was entered, Mother tested positive for methamphetamines, and was required to reengage with substance abuse treatment through HRC.

¶ 9    The circuit court entered a dispositional order on August 12, 2021, finding that it was in the best interests of the children that they be made wards of the court. Mother was found unfit or unable to parent the children. DCFS received custody and guardianship.

¶ 10    On August 3, 2022, the State filed motions to terminate parental rights for each of the children. The State claimed that Mother's parental rights should be terminated because she failed to maintain a reasonable degree of interest, concern, or responsibility as to her children's welfare, and she failed to make reasonable progress toward the return of her children within nine months after adjudication of neglect. The motion did not specify the nine-month time period when Mother had not made reasonable progress.

¶ 11    The hearing on the termination of parental rights took place on January 19, 2023. Mother requested a continuance and argued that she was told the day before the trial that she had tested positive for illegal substances. Mother wished to challenge the results of the drug test through a hair follicle sample test. The continuance was denied, and the circuit court proceeded with the fitness hearing.

¶ 12    Morgan Kent, a child welfare advanced specialist with DCFS, was the only witness to testify during the fitness hearing. Kent was assigned as the caseworker in this matter in July of 2020, and she remained as the caseworker through the date of the hearing. According to Kent, during the time frame of March of 2021 to December of 2021, Mother was required to complete substance abuse treatment, individual therapy, a psychiatric assessment, and domestic violence counseling. Kent clarified that the domestic violence requirement was a component of her individual therapy sessions.

¶ 13    Kent testified that Mother completed substance abuse treatment in October of 2020, through HRC. Mother subsequently tested positive for methamphetamines in April of 2021. Due

to that relapse, Mother was required to reengage in substance abuse services. Mother restarted treatment in September of 2021. Mother missed a drug test screen in September of 2021, and she refused a drug test in November of 2021. Consequently, Mother did not complete substance abuse treatment during the time frame of March 2021 to December 2021.

¶ 14    During the time period from December of 2021 to August of 2022, Mother was engaged in treatment at HRC. Kent requested that Mother complete three drug screens during that time period, and Mother did not comply with Kent's requests. Mother did, however, complete multiple drug screens through HRC, and those tests were negative. Kent testified that Mother had a positive drug screen in December of 2022.

¶ 15    Kent testified that Mother never completed individual therapy or domestic violence requirements. Mother was discharged from therapy services in June of 2021, for failing to attend. Mother reengaged in individual therapy in January of 2022, but she continued to miss sessions and was discharged again. Mother was under the impression that she completed the individual therapy requirement during her substance abuse therapy. Kent addressed this issue and during her conversation with Mother, Kent clarified that the individual therapy requirement was separate from substance abuse therapy. According to Kent, Mother reengaged in individual therapy in November of 2022, and she completed a psychiatric evaluation in December of 2022.

¶ 16    On cross-examination, Kent testified that during the time period of December 2021 to August of 2022, Mother had not been discharged from HRC for lack of attendance. Mother was discharged from HRC after August of 2022, because she transferred to a substance abuse treatment program through Preventative and Treatment Services (PATS). Mother completed a seven-week substance use treatment course through PATS. Kent testified that she did not believe that the individual therapy that Mother received through PATS was sufficient because she had not

4

completed a mental health assessment to initiate individual therapy. Kent was shown respondent's Exhibit A, a document from PATS. Kent testified that Exhibit A "indicated that they did substance use treatment, domestic violence, and individual therapy."

¶ 17    Kent was then shown respondent's Exhibit B, a certificate of discharge dated October 3, 2022, signed by Patricia Ray MSW, LCSW, LPHA. The certificate indicated that Mother began the PATS program on August 9, 2022, and completed the program on October 3, 2022. According to the certificate of discharge, Mother "appeared to have a good understanding of substance abuse, family, and personal violence, and how to manage moods without using substances" and her diagnosis was "304.40 in remission."[1] Kent was familiar with Exhibits A and B because PATS had previously provided Kent with copies of those documents. Exhibits A and B were admitted into evidence without objection.

¶ 18    Kent was additionally shown respondent's group Exhibit C (1-8) and recognized the exhibits as drugs screens from HRC dated December 7, 2021, December 14, 2021, January 14, 2022, January 25, 2022, February 5, 2022, March 8, 2022, May 10, 2022, and June 16, 2022. The drug screens were all negative. Exhibit C was admitted into evidence. No positive drug screens were admitted into evidence.

¶ 19    Kent testified that Mother visited with her children twice a week during the time frame of March of 2021 through October of 2021. During that time, Mother was consistent with visitation and interacted well with her children. Mother missed visits with her children in November of 2021, which resulted in a reduction of visitation time to once a week. From December of 2021 until August of 2022, Mother visited with the children once a week. Mother attended the visits with her

---

[1]According to the DSM-5, 304.40 is a stimulant use disorder for amphetamine use. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 5th Edition, DSM-5 *Stimulant Use Disorder* 561-67 (2013).

5

children during that time frame. Kent testified that Mother would bring snacks to the visits, there were no safety concerns, and Mother interacted well with the children.

¶ 20    Kent additionally testified that DCFS was concerned that Mother "had been engaged off and on with HRC for over a year and a half and had not been successfully discharged and then suddenly was able to complete this in a seven-week period of time." Kent additionally testified that Mother had not been participating in the DCFS drug screens, and the HRC drug screens were not satisfactory because they were not random.

¶ 21    After Kent's testimony concluded, the State requested to amend its motion to terminate parental rights to include two nine-month periods, from March of 2021 to December of 2021, and December of 2021 to August of 2022, where Mother had not made reasonable progress towards the return of the children. The circuit court granted the motion to amend without objection.

¶ 22    The State argued that Mother had made efforts but had not demonstrated reasonable progress. Mother was "off and on" regarding treatment. The State argued that the progress made by Mother was negated by a positive drug test in December of 2022. Mother's inconsistency with individual therapy was not reasonable according to the State.

¶ 23    Mother argued that the State did not meet their burden regarding the allegation that Mother failed to maintain a reasonable degree of interest, concern, or responsibility to her children's welfare. Mother attended and engaged with the children for a majority of the visits. Mother additionally argued that the State failed to meet their burden regarding the allegation that Mother failed to make reasonable progress towards the return of the children within the specified nine-month periods. Mother acknowledged that she relapsed in April of 2021; however, she subsequently completed treatment. Mother made reasonable progress to finish the program where

6

she completed substance abuse treatment, individual therapy, and psychiatric services through PATS.

¶ 24 Mother additionally argued that the State did not dispute the validity of the PATS program. No argument was made that the PATS program was not a licensed facility in Illinois or that the caseworker did not approve the PATS program. Mother had completed random drug screenings through HRC as she was not tested at every appointment. The HRC drug tests were negative.

¶ 25 The guardian *ad litem* (GAL) argued that Mother did not comply with her service requirements during the first nine-month period. Mother improved during the second nine-month period. The GAL argued that the court should not consider progress made outside of the two nine-month periods and Mother should be found unfit.

¶ 26 The circuit court found that, "the State has met the burden regarding as to the mother under paragraph 4B, that she has failed to make reasonable progress towards the return of the child within nine months after an adjudication of neglect." The circuit court then clarified that the finding applied to either of the nine-month periods identified. The circuit court additionally noted the parents had not made reasonable efforts or progress towards the goal of having the children return home during permanency hearings.

¶ 27 Immediately after the fitness hearing concluded, the circuit court held the best interest hearing. Morgan Kent, the caseworker, was the only witness during the best interest hearing. The foster parents did not testify. Kent testified that the children were placed in traditional foster homes. D.H. and G.J. were placed together in a home with one adult. R.H. was placed separately with a family that had a minor child who was younger than R.H. According to Kent, the foster families interacted with each other multiple times a month.

7

¶ 28    Kent did not have any concerns about the condition of the foster homes. The children had their own bedrooms. The foster parents engaged appropriately, and the children appeared to be attached to their foster parents. Both foster families had expressed to Kent that they wanted to adopt the children.

¶ 29    Kent did not have any concerns regarding attendance at school. R.H. was 2½ years old and too young for school. Kent testified that G.J. worried about her Mother. G.J. indicated that she felt safe at the foster home and did not feel safe returning to Mother. On occasion, five-year-old D.H. did not want to go to visitation with Mother. Kent was unaware of the reason and did not know whether it was related to Mother.

¶ 30    The State argued that there were no concerns with the foster parents' housing, and the siblings remained bonded even though they were in separate homes. The foster parents interacted with the children appropriately, the school aged children were receiving an education, and the foster parents expressed a commitment to provide permanency. The State believed that it was in the children's best interest for Mother's parental rights to terminate. Mother requested that the circuit court find that it was not in the children's best interest to terminate her parental rights.

¶ 31    After closing arguments, the circuit court stated:

"I don't doubt that the two parents here whose rights we're talking about do care for these children. However, I am going to find that the State has met their burden. It would be in the best interest of the children that each of the—of the parents' parental rights be terminated."

¶ 32    The circuit court made a docket entry which indicated that the parents were unfit, and it was in the children's best interest to terminate parental rights. The circuit court did not enter a formal written termination order with specific findings.

¶ 33    On January 24, 2023, Mother filed a motion to reconsider. Mother argued that the State failed to prove parental unfitness by clear and convincing evidence where Mother successfully

8

completed the PATS program from substance abuse, individual therapy, and domestic violence counseling in October of 2022. Mother additionally argued that it was not in the children's best interest to terminate Mother's parental rights where the children were separated from each other. The circuit court denied the motion to reconsider. This appeal followed.

¶ 34                                    II. ANALYSIS

¶ 35    On appeal, Mother argues that the circuit court erred in terminating her parental rights. Mother argues that both the fitness and the best interest determinations were against the manifest weight of the evidence.

¶ 36    "A parent's right to raise his or her biological child is a fundamental liberty interest, and the involuntary termination of such right is a drastic measure." *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 28. Termination of parental rights proceedings are governed by the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq*. (West 2022)) and the Adoption Act (750 ILCS 50/0.01 *et seq*. (West 2022)). *In re D.T.*, 212 Ill. 2d 347, 352 (2004). A petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act, which delineates a two-step process to terminate parental rights involuntarily. 705 ILCS 405/2-29(2) (West 2022). The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). 705 ILCS 405/2-29(2), (4) (West 2022); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). Because each of the statutory grounds of unfitness is independent, the circuit court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds. *In re C.W.*, 199 Ill. 2d 198, 217 (2002). If the circuit court finds a parent to be unfit, then the cause proceeds to a determination of whether it is in the best interest of the child for the parent's rights to be terminated. 750 ILCS 50/1(D) (West 2022); *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000).

9

¶ 37 Each case concerning parental fitness is unique and must be decided on the particular facts and circumstances presented. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). The circuit court's finding of unfitness is given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). The circuit court's factual findings will not be reversed unless they are against the manifest weight of the evidence. *In re M.J.*, 314 Ill. App. 3d at 655.

¶ 38 The State's motion to terminate Mother's parental rights alleged that Mother was unfit for failing to maintain a reasonable degree of interest, concern, or responsibility as to her children's welfare (750 ILCS 50/1(D)(b) (West 2022)) and that Mother failed to make reasonable progress toward the return of the children within nine months following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2022)).

¶ 39 When determining whether Mother had demonstrated interest, concern, or responsibility, the circuit court may consider evidence regarding the completion of the service plan. *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 35. This ground of unfitness is not subject to the time limitations contained in section 1(D)(m) of the Adoption Act. See 750 ILCS 50/1(D)(b) (West 2022). The circuit court made no findings regarding this ground for unfitness.

¶ 40 The circuit court found that Mother was unfit solely based on section 1(D)(m)(ii). See 750 ILCS 50/1(D)(m)(ii) (West 2022). "Reasonable progress" is an objective standard focused on the goal of returning the child to the parent. *In re D.D.*, 309 Ill. App. 3d 581, 589 (2000). Progress is measured by the parent's compliance with the court's directives, services plans, or both and requires the parent to make measurable or demonstrable movement toward the reunification goal in the near future. *In re Daphnie E.*, 368 Ill. App. 3d at 1067.

¶ 41    When determining whether Mother has made reasonable progress towards the return of her children, the circuit court only considers the evidence occurring during the relevant nine-month period. *In re Z.M.*, 2019 IL App (3d) 180424, ¶ 68. Section 1(D)(m) requires the State to file a pleading that specifies the nine-month period or periods it relied on in its petition to terminate parental rights. 750 ILCS 50/1(D)(m)(ii) (West 2022). We note that the State did not include specific nine-month periods in its motion to terminate Mother's parental rights or file a separate notice. After the conclusion of testimony, the circuit court allowed the State to orally amend its motion to include two nine-month periods: (1) March of 2021 to December of 2021, and (2) December of 2021 to August of 2022. We additionally note that the time frame between December 1, 2021, to August 1, 2022, is an eight-month period.

¶ 42    The State's error in specifying an applicable nine-month period is a pleading defect and does not equate to a failure to state a cause of action. *In re S.L.*, 2014 IL 115424, ¶ 21. Section 2-612(c) of the Code of Civil Procedure states that "[a]ll defects in pleadings, either in form or substance, not objected to in the trial court are waived." 735 ILCS 5/2-612(c) (West 2022). Mother did not object to the State's motion to amend or to the calculation of the nine-month time period before the circuit court and the parties proceeded at trial as if all possible nine-month periods were relevant. As such, we consider the two consecutive nine-month periods after the written order of adjudication was entered on March 4, 2021.

¶ 43    The situation that triggered the removal of Mother's children was the birth of a child with drugs in his system. Mother's service plan was created to correct the conditions that were the basis for the removal of the children and her plan required substance abuse treatment, individual therapy, a psychiatric assessment, and domestic violence counseling.

11

¶ 44    *In re F.S.* addressed a similar situation where children were removed from a parent's care due to drugs. *In re F.S.*, 322 Ill. App. 3d 486 (2001). In *F.S.*, a parent participated in a drug dependency program that DCFS did not recommend, and she made progress and satisfied service plan obligations outside of DCFS programs. *In re F.S.*, 322 Ill. App. 3d at 493. Requiring specific compliance would contravene "the explicit statutory purpose of preserving and strengthening family ties whenever possible." *In re F.S.*, 322 Ill. App. 3d at 492.

¶ 45    Here, Mother's caseworker initially testified that Mother never completed individual therapy or domestic violence requirements. On cross-examination, Mother's caseworker acknowledged that Mother had completed a program that addressed individual therapy and domestic violence. The certificate of discharge confirmed that Mother had a "good understanding" of substance abuse, domestic violence, and "how to manage moods without using substances." The caseworker expressed concerns about the PATS program; however, no testimony was presented that the PATS program was not an approved treatment provider. The caseworker additionally testified that there were no safety concerns during visitation and Mother interacted well with the children.

¶ 46    While the PATS program itself may have satisfied the requirements of Mother's service plan, the circuit court was required to consider evidence of reasonable progress made during the relevant nine-month periods. After the children were removed from Mother's care, she completed a substance abuse program prior to adjudication, prior to the initial nine-month period. Then, during the initial nine-month period of March of 2021 to December of 2021, Mother relapsed and tested positive for methamphetamines. Mother was required to reengage in services and re-enroll with HRC as required by DCFS. Mother transferred programs in August of 2022, during the eighth month of the second nine-month period. It appears that Mother successfully completed a program

12

in October of 2022, outside of both nine-month periods. The evidence demonstrated that Mother was unfit because she had not made reasonable progress towards the reunification of her children during either nine-month period.

¶ 47     While the circuit court's finding may be affirmed where the evidence supports a finding that Mother failed to make reasonable progress towards the return of her children within a nine-month period, the circuit court did not address the allegation that Mother maintained a reasonable degree of interest, concern, or responsibility as to her children's welfare. The record is unclear on whether the circuit court considered Mother's progress during the time she was enrolled in the PATS program. Notably, the circuit court's determination regarding the evidence of the parent's conduct occurring outside of the nine-month period may be introduced during the best interest hearing if a parent is found unfit under section 1(D)(m). *In re D.L.*, 191 Ill. 2d 1, 12 (2000).

¶ 48     The circuit court proceeds to the best interest hearing after finding a parent unfit and determines whether it is in the best interest of the child for the parent's rights to be terminated. 750 ILCS 50/1(D) (West 2022); *In re M.J.*, 314 Ill. App. 3d at 655. At this stage of the proceedings, the circuit court's focus shifts to the best interests of the child and away from the rights of the parent. *In re P.S.*, 2021 IL App (5th) 210027, ¶ 30. "The parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364.

¶ 49     The State is required to prove by a preponderance of the evidence that it is in a child's best interest to terminate parental rights. *In re B.B.*, 386 Ill. App. 3d 686, 699 (2008). A finding that termination is in the child's best interest will not be reversed unless it is contrary to the manifest weight of the evidence. *In re M.F.*, 326 Ill. App. 3d 1110, 1116 (2002). A determination is against

the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result. *In re D.M.*, 336 Ill. App. 3d 766, 773 (2002).

¶ 50 When determining the child's best interests, the circuit court is required to consider, in the context of the child's age and developmental needs, the following:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

14

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2022).

"While all of the above-cited factors must be considered, no factor is dispositive." *In re Austin W.*, 214 Ill. 2d 31, 50 (2005).

¶ 51 In this case, the caseworker testified that the foster parents had expressed to her that they were willing to adopt the children. Permanence includes "the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives." 705 ILCS 405/1-3(4.05)(g) (West 2022). G.J. and D.H. were placed together in a traditional foster home. They were not placed with relatives, and they were separated from their sibling, R.H.

¶ 52 The foster parents did not testify. The caseworker was the only witness and she provided minimal testimony on the physical safety and welfare of the children, the development of the children's identities, and the children's sense of attachments. The children are young, and the two youngest children were unable to express their wishes to the caseworker. No testimony was presented on the children's community ties, the uniqueness of the family, or risks attendant to entering and being in substitute care.

¶ 53 The circuit court found that Mother cared for her children, but it did not articulate its view on the statutory factors. The circuit court did not make specific findings of fact on the record during the best interest hearing and the record does not contain a written order with specific findings. This court does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). We cannot, however, defer to a determination that was never made. Accordingly, we reverse the trial court's order finding it was in the best interests of the children to terminate Mother's parental rights and remand the case to the trial court for a new hearing on the children's best interests.

¶ 54                          III. CONCLUSION

¶ 55    After reviewing the minimal evidence presented by the State during the best interest hearing and the lack of findings by the circuit court, we reverse the trial court's order finding it was in the best interest of the children to terminate Mother's parental rights and remand the matter to the circuit court for further proceedings.

¶ 56    Reversed and remanded.