2024 IL App (2d) 240177-U
No. 2-24-0177
Order filed July 30, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* K.R.M., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| | ) | |
| | ) | No. 21-JA-152 |
| | ) | |
| (The People of the State of Illinois, Petitioner- | ) | Honorable |
| Appellee v. Melissa Debias, Respondent- | ) | Reginald C. Mathews, |
| Appellant). | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Schostok and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*: Respondent's due process claims are forfeited, and the circuit court did not err in finding that the termination of respondent's parental rights was in the best interest of K.R.M.

¶ 2    Respondent, Melissa Debias, appeals the circuit court's finding that the termination of her parental rights was in her daughter's, K.R.M., best interests. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                        A. Background and Fitness Proceedings

¶ 5    Respondent and Renee M. have one child together, K.R.M., born July 18, 2019. This same day, the Department of Children and Family Services (DCFS) became aware of a situation wherein

Renee acted belligerent toward hospital staff and respondent left newborn K.R.M. alone in the hospital room so she could defend Renee M.'s behavior. K.R.M. was taken into protective custody. After a shelter-care hearing, the court entered a protective-care order on July 23, 2019, that allowed K.R.M. to be returned to respondent's care. However, also as a part of this order, DCFS opened an intact family case and respondent was to have no contact with Renee M. and avoid consuming, possessing, or ingesting controlled substances. K.R.M. was in respondent's care for about four months.

¶ 6      On December 3, 2019, respondent violated the protective order and, thereafter, K.R.M. was placed in the temporary custody of DCFS as probable cause existed that K.R.M. was a neglected minor.[1] Respondent was also ordered to cooperate with DCFS, comply with the terms of her service plan, and correct the conditions that caused K.R.M. to be in care. K.R.M. was placed in the relative-foster home of Elizabeth Menchaca, respondent's friend's mother, on December 5, 2019, and remained in her custody throughout the pendency of the proceedings. On December 17, 2019, K.R.M. was adjudicated a neglected minor. K.R.M. was to remain in DCFS custody, and respondent was to have supervised visitation; refrain from using alcohol or illicit drugs; maintain adequate living arrangements; maintain employment; and complete the following assessments and programs: drug and alcohol, parenting classes, domestic violence, and mental health evaluations.

¶ 7      The first service plan rated the period from December 2019 to June 2020. During this time, respondent was required to seek the following services: substance abuse counseling, domestic violence counseling, parenting classes and coaching, mental health evaluation and services,

---

[1]This is based on the testimony at the termination hearings, as the transcripts from the permanency hearings are not a part of the record on appeal.

maintain stable housing and income, and attend supervised visitations with K.R.M. Respondent was rated unsatisfactory in all areas, except she complied with three out of seven toxicology screenings, attended a February 2020 family team meeting, and completed mental health and domestic violence assessments and was referred to services. However, during this time, respondent had weekly visitation but only exercised visitation seven times.

¶ 8      The next service plan rated the period June 2020 to December 2020. During this time, respondent was rated unsatisfactory for the following services: parenting classes, substance abuse, mental health and therapy, and proof of housing and income. Specifically, the plan noted that respondent had not been compliant with toxicology screenings and, thus, needed to restart substance abuse services; she also remained in a relationship with her abuser, thus, the domestic violence concerns needed to be addressed before implementing parenting classes; and she did not maintain contact with her DCFS caseworker or exercise visitation, thus, her visitation was suspended on July 15, 2020.

¶ 9      In the final rating period, December 2020 to June 2021, respondent was again rated unsatisfactory in the aforementioned service areas. Respondent refused to schedule parenting classes and was inappropriate with the service advocate; she failed to complete substance abuse treatment and required a new assessment because of the time lapse; she did not inquire about K.R.M. after visits were suspended; and, apart from a DCFS contact in April 2021, respondent had not contacted the agency since November 2020. Because of respondent's failure to comply with services, the order suspending visitation remained intact.

¶ 10      On July 8, 2021, the State petitioned to terminate respondent's parental rights. An amended petition was, thereafter, filed on March 2, 2022. During the pendency of the case, the court ordered DCFS to continue paying for services for respondent.

¶ 11    A hearing on the State's petition began on July 18, 2023. At the hearing, Cyndi Casas, the supervisor of foster care case management with Arden Shore Child and Family Services (Arden Shore), testified to the aforementioned service plans and ratings. Casas was not originally involved in this case but eventually became involved because of another caseworker's departure from Arden Shore. The service plans and the original protective order were admitted into evidence without objection. On cross-examination Casas testified that she did not know if respondent received a copy of the service plan before she became involved in the case in February 2021; however, the required services for reunification remained consistent since August 2019, when this was an intact case. Casas noted that respondent failed to confirm her housing and, thus, she was unsure if another worker or the court confirmed respondent's address such that a service plan could be mailed out. Respondent did attend some court hearings during this time, and the required services were discussed with respondent, but court hearings were conducted virtually, so a copy was never given to respondent in-person. Casas indicated that she emailed the service plan to respondent after she became involved in the case. Overall, Casas believed that respondent knew what services she needed to complete to reunify with K.R.M.

¶ 12    Regarding the service plan rated on June 2020, respondent did not receive a domestic violence assessment and was rated unsatisfactory because respondent and her abuser were present for the assessment appointment. Thereafter, respondent failed to answer the phone for her scheduled domestic violence assessment. Casas did not believe that the case management team attempted to conduct the evaluation in a different manner with respondent after this failed attempt.

¶ 13    Additionally, Casas testified to the mental health, domestic violence, and shelter services Arden Shore attempted to provide. Arden Shore's priority was securing shelter for respondent away from her abuser but also appreciated that auxiliary services like mental health and domestic

violence counseling could be provided in-shelter. Casas noted that respondent sought services for alternative housing, but when shelter was secured, respondent did not accept that assistance. Respondent did, however, enter a shelter between June and October of 2021, but left shortly after entry to rejoin her abuser. Moreover, although rated unsatisfactory as to the June 2021 service plan, respondent did not have any police encounters or domestic-violence incidents with her abuser, which satisfied the stated goal. The caseworkers, however, believed that respondent still had an ongoing relationship with her abuser, despite respondent's denial.

¶ 14　　Next, Casas's testimony indicated that although the service plan noted that respondent had not been in communication with K.R.M. through the agency before April 2022, respondent had family friends in common with the foster family and was receiving updates outside of agency channels. Casas was unsure if the foster mother would divulge information about K.R.M. to ultimately be provided to respondent.

¶ 15　　Casas stated that respondent was also diagnosed with substance abuse issues and had mental health concerns. Services were offered to respondent, however, she never followed through with these services. Respondent was never given a parenting coach referral by Arden Shore because her visits with K.R.M. were suspended shortly after coaching was ordered.

¶ 16　　Respondent testified that her 11-month-long relationship with Renee M. was very violent and very toxic. He had drug and alcohol issues, exhibited controlling behavior, and belittled her. Respondent also struggled with drugs but denied alcohol abuse. Respondent testified that Renee M. isolated her, destroyed her cell phones and mail, confiscated her property, and locked her in the house with surveillance cameras to keep her home. He was also physically and mentally abusive when she was pregnant with K.R.M. Respondent admitted that her environment with Renee M. would not have been safe for a child.

¶ 17    Respondent testified that, in June 2021, things escalated and Renee M. beat and kicked her causing her to lose a tooth. As a result of this incident, Renee M. was charged with a criminal offense. Respondent indicated that she wished to leave Renee M. but was broken down, reliant on him, and scared. Eventually, respondent relapsed after Renee M. coerced her into smoking methamphetamine. Respondent stated she knew she had a caseworker and that there was an ongoing DCFS case. She lost contact with the agency after Renee M. pushed her to smoke methamphetamine. She stated that she and Renee M. shared a cell phone, and he controlled that phone. As a result, she did not communicate with her caseworker for approximately one year.

¶ 18    Respondent testified that she sought therapy either late in 2020 or early 2021 but was unsure if she completed therapy before the petition for termination of parental rights was filed. She eventually broke up with Renee M. in September of 2021, when she called police and he was arrested. Thereafter, respondent moved in with family in Chicago because she was unemployed. Respondent testified that during her relationship with Renee M., Casas did not offer her domestic violence assistance. Respondent stated that she discovered A Safe Place (around K.R.M.'s birth) and another domestic violence shelter, Women and Children's Horizon, on her own. Respondent indicated that while at Women and Children's Horizon she briefly communicated with her DCFS caseworker. However, both times after she sought shelter, Renee M. discovered her location and she left with him because she "didn't want him to get hurt." She also stated that she kept returning to Renee M. because she was not receiving the mental health treatment she needed. On cross-examination, however, respondent noted that she did not seek help (leaving the abusive situation) from her obstetrician, the hospital staff, Arden Shore (during an evaluation), or during her substance-abuse evaluation with NICASA.

¶ 19    When DCFS took custody of K.R.M., respondent received either weekly or bi-weekly updates about her child through her best friend, who was related to the foster mother through adoption. Thus, respondent did not seek agency updates about K.R.M. She did not know K.R.M.'s address, so she could not send her cards or gifts; however, respondent could not remember if her caseworker told her that cards and gifts could be passed on through the agency. Respondent also did not initiate calls with K.R.M. because she believed that all her contact with K.R.M. needed to be supervised.

¶ 20    On October 18, 2023, the court heard closing arguments by the parties and found that the State had proven by clear and convincing evidence that the respondent was an unfit parent in that she failed to make reasonable efforts to correct the conditions that were the basis for K.R.M.'s removal and she failed to make reasonable progress toward the return of K.R.M. during any nine-month period (December 19, 2019, to September 19, 2020, or September 20, 2019, to June 20, 2021) that followed the adjudication of K.R.M. as a neglected minor. 750 ILCS 50/1(D)(m)(i)-(ii) (West 2022).

¶ 21                          B. Best-Interests Proceedings

¶ 22    The case proceeded to a best-interests hearing on October 18, 2023. Wendy Shankman, an expressive art therapist, testified that she began working with K.R.M. in December 2022 to address issues K.R.M. was having after visitation with respondent resumed. Shankman indicated that she received information about this case from K.R.M., the foster mother, and the caseworker. Shankman was not asked to complete a bonding assessment with K.R.M., nor did she observe K.R.M. with respondent. She also did not receive any reports from respondent's parenting coach indicating there was a bond. Shankman, however, was not directed to work with respondent, as the goal at the time of her intervention was substitute care pending termination.

¶ 23    Through Shankman's sessions with K.R.M., she discovered that K.R.M. identified as a member of her foster family and did not spontaneously bring up respondent. K.R.M. particularly related to her foster mother and 11-year-old foster sister. When K.R.M. was asked to draw a picture of her visitations with respondent, she drew the respondent in the picture but did not prioritize her and refused to draw herself in the picture. Shankman also testified that K.R.M. did not like getting hugs on visits, she did not always want to attend visits, and she did not show evidence of having a bond with respondent. As therapy progressed, K.R.M. indicated that she liked to play at her visits. Shankman testified that, overall, K.R.M. has become less adverse to visitation but she did not see evidence of a bond. She believed that it would be disruptive for K.R.M. to leave her foster family because she is attached to them, sees them as her family, and has no memories of living anywhere else.

¶ 24    Next, Rosemarie Reid, the Court Appointed Special Advocate (CASA) for K.R.M., testified that she completed foster home visits and observed K.R.M. with her foster family. She observed K.R.M. call her foster mother "mommy" and her foster father "dada." She was aware that K.R.M. participated in family traditions, camping trips, water-park outings, and holiday trips with her foster family. Overall, Reid indicated that there "very much so" was a bond between K.R.M. and her foster family. Reid also observed visits between respondent and K.R.M. She testified that the interactions between respondent and K.R.M. were "very pleasant" and had a comfortable energy. She observed K.R.M. both accept and resist an embrace from respondent but noted that, often, affection was not reciprocated. Reid did not believe that she had the expertise to determine if there was a bond between respondent and K.R.M.; however, she believed that it was "definitely" in K.R.M.'s best interests to remain with the foster family.

¶ 25    Casas testified that K.R.M. had been in her foster mother's care since she was four-and-a-half months old. The placement met all K.R.M.'s needs, and she was bonded with her foster family. K.R.M. remained open to physical affection, and her demeanor was more open with her foster family than to visits with respondent.

¶ 26    Casas observed several supervised visits between K.R.M. and respondent after visitation was reinstated in 2022 and K.R.M. was placed in services because of her refusal to attend visitation. At this time, respondent progressed from monthly to weekly supervised visits, however, she never graduated to unsupervised visitation. When asked about visitation concerns, Casas stated that respondent prioritized her desire for a bond with K.R.M. over the child's level of comfort. Respondent denied Casas' allegations and noted that Casas was "against her." Casas also had concerns regarding the parenting coach respondent enlisted because, from the inception of her services, she believed K.R.M. had a bond with respondent. Casas believed there was not a bond between K.R.M. and respondent, but K.R.M. did look forward to the gifts or treats she received during visits. Casas thought there was a significant bond between K.R.M. and her foster family and, thus, indicated that it was in K.R.M.'s best interests to remain with her foster family.

¶ 27    Next, Jeffrey Holmes, a Haymarket Center (Haymarket) employee who previously completed intake reports, testified that he completed a Global Appraisal of Individual Needs (GAIN) assessment with respondent on April 15, 2023. During the assessment, respondent stated that her choice of substances were alcohol and cocaine. Respondent reported that she started using alcohol at the age of 16, drank 48 out of the last 90 days, and usually drank about 8 alcoholic drinks each time she consumed alcohol. At most, respondent reported that she drank 175 milliliters in one 24-hour timespan. Regarding cocaine, respondent indicated she used 48 out of the last 90 days, with her daily average being 10 "dime bags" in a 24-hour timespan. She also reported seeking

treatment with Haymarket two other times. As a result of this report, respondent was recommended for residential treatment.

¶ 28    The foster mother, Elizabeth Menchana, testified that she received a call from her cousin, respondent's friend, indicating that respondent needed someone to care for K.R.M. Menchana completed the required background checks, and K.R.M. was placed in her care on December 6, 2019, and has remained with her throughout the pendency of the case. Menchana stated that K.R.M. does everything with her including, occasionally, traveling with her and her husband, who owns and operates a semi-truck. Menchana stated that she was committed to caring for and eventually adopting K.R.M.

¶ 29    During the pendency of this case, Menchana's brother, Nicholas D'Andrea, lived with her sometime between November 2021 and early 2022. D'Andrea testified that Menchana told him to lie to the caseworker and say he was only staying for the weekend because Menchana knew that he could not live there without DCFS approval. D'Andrea was concerned that on a couple of occasions he believed that K.R.M., a toddler at this time, was alone in her crib while Menchana and her children were out of the house. He also heard several instances where Menchana or her children would correct K.R.M. that respondent was not her "mom," but that Menchana was. He witnessed K.R.M. ask for respondent after returning from visits and throw tantrums when her requests were denied. At the end of D'Andrea's stay with Menchana, there were two verbal disputes that resulted in 911 calls or police intervention but K.R.M. did not witness these disputes.

¶ 30    Cheri Tobolski, a therapist at Pillars Community Health, testified that respondent had been a member of her domestic violence group since February 2022. Tobolski believed that respondent was more aware of the elements of domestic violence and ways to protect herself because of group therapy.

¶ 31    The final witness was Holly Sutton a family advocate worker, and respondent's parenting coach, with Family Focus. Sutton was assigned to respondent's case on September 8, 2022. Because of COVID concerns, the parenting-coaching sessions were completed virtually starting on November 28, 2022. Sutton observed respondent and K.R.M.'s visits via Zoom. Sutton stated that K.R.M. and respondent looked for books, read together, enjoyed snacks, and played; all their interactions were appropriate, and feedback was not warranted. Sutton recalled one visit where respondent hugged the child, and the affection was reciprocal. During a Christmas visit, respondent brought gifts and K.R.M. became upset because she was allowed to keep only one of the four gifts. The caseworker explained that gifts were limited to prevent respondent from buying K.R.M.'s affection. Sutton was not aware of any rules regarding gifts and did not inquire further because she and Casas had a contentious working relationship. In total, Sutton observed eight visits and respondent received a certificate of completion on February 20, 2023. Through her observations, Sutton believed that respondent and K.R.M. "definitely" had a bond. Sutton did not observe any fear or apprehension, crying, throwing tantrums, or general discomfort between respondent and the child, which would indicate to her the absence of a bond. Sutton did not observe K.R.M.'s drop-offs for visitation, and she did not know why K.R.M. was in therapy.

¶ 32    On November 5, 2023, during the pendency of the best-interests phase, the State informed the circuit court that respondent's visits were suspended because she tested positive for cocaine. The court upheld DCFS's decision to suspend visitation. On December 5, 2023, Casas prepared a report and noted that, on November 14, 2023, respondent failed to attend a toxicology screening.

¶ 33    On January 25, 2024, the circuit court found that the State had met its burden, and it was in the best interests of K.R.M. that respondent's parental rights be terminated. Specifically, the court noted that respondent was concerned more about Renee M. than her own and K.R.M.'s well-

being and that mindset was never treated with services because respondent avoided services. Additionally, less than a year before, respondent was evaluated at Haymarket and her use of alcohol was "out of control" and her use of cocaine was "alarming," and nearly a month before respondent tested positive for cocaine. The court stated that domestic violence and substance abuse had gone unchecked in respondent's life and her time to remedy the situation had run out. The court concluded that K.R.M. needed permanency and stability and that she would not get this with respondent, but she had consistently got this with her foster family. K.R.M. was attached to her foster family, had a sense of identity there, and her placement with the foster family was the least destructive outcome. Considering the factual findings and the statutory factors, the court found it was in K.R.M.'s best interests to terminate respondent's parental rights.

¶ 34    Respondent timely appealed.

¶ 35                                  II. ANALYSIS

¶ 36    On appeal, respondent challenges the circuit court's finding that it was in the best interests of K.R.M. to terminate her parental rights. Specifically, respondent contends that (1) her procedural due process rights were violated when DCFS failed to ensure she received copies of the service plan; (2) the circuit court erred in terminating respondent's parental rights when it failed to consider the fact that DCFS created a process which ignored the goal of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (2022)) to reunite families; (3) DCFS failed to offer respondent supportive services despite its recognition of respondent's mental health struggles; and (4) the circuit court erred in terminating respondent's parental rights when DCFS failed to adequately and fairly assess the bond between respondent and K.R.M.

¶ 37    Termination of parental rights under the Act is a two-step process. *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 1. The State first must establish by clear and convincing evidence at least one

ground of parental unfitness from those listed in section 1(D) of the Adoption Act (750 ILCS 50/1 *et seq.* (West 2022)). *In re B.B.,* 386 Ill. App. 3d 686, 698 (2008); *Julian K.*, 2012 IL App (1st) 112841, ¶ 2. If the parent is found unfit, the court must then conduct a second hearing to determine, by a preponderance of the evidence, whether it is in the best interests of the minor to terminate parental rights. *B.B.*, 386 Ill. App. 3d at 698. We will not disturb a circuit court's decision at a termination hearing unless it is against the manifest weight of the evidence. *In re Tamera W.*, 2012 IL App (2d) 111131, ¶ 43. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 38                                    A. Forfeiture

¶ 39      We first consider respondent's argument that her due process rights were violated when DCFS failed to ensure that she received a copy of the service plan, which detailed the tasks and service she needed to complete to reunify with K.R.M, and where DCFS failed to offer the respondent individualized supportive services. The State argues that these issues have been forfeited as counsel failed to raise these issues in the circuit court and provide a complete record on appeal. We agree with the State.

¶ 40      As to respondent's claim that DCFS failed to provide supportive services, the issue is forfeited because counsel failed to raise this issue in the circuit court. Although a post-adjudication motion is not required in a termination proceeding, forfeiture principles still apply under the Act. *In re M.W.*, 232 Ill. 2d 408, 430 (2009). Meaning, an objection must be made before the circuit court to allow the court an avenue to correct its errors. *Id.* This issue was never raised before the circuit court, and, accordingly, there is no evidence or testimony addressing the claim that the order in which services were provided was improper. Because this issue was not raised before and

counsel failed to address plain error, the issue is forfeited. See *People v. Moss*, 205 Ill. 2d 139, 168 (2001).

¶ 41 As to respondent's claim that DCFS failed to provide her copies of her service plan, she has also forfeited that claim. Respondent claims that she was not provided service plans during the pendency of her case. However, this issue was not raised before the circuit court. For the same reasons stated above, the claim is forfeited. In addition to counsel's failure to object, the service plans were also admitted into evidence without objection and respondent's testimony failed to mention that she never received the service plans, despite acknowledging that she engaged in limited services consistent with the service plans. Additionally, documents such as the order of protection entered on July 23, 2019, the temporary custody order on December 3, 2019, and an order entered on February 13, 2020, advised respondent of the general nature of the services she needed to complete and her required cooperation with the terms of her service plan. Based on the foregoing, disregarding forfeiture, the sparse evidence supports the conclusion that respondent and her counsel had knowledge of the contents of the service plan and the services she was required to complete since the inception of this case. *People v. Keener*, 275 Ill. App. 3d 1, 6 (1995) ("Attorneys representing clients before the appellate courts are presumed to have knowledge of the contents of the record.").

¶ 42 Second, respondent failed to provide this Court with transcripts from the permanency review hearings, when the service plans would have been discussed with respondent. See 705 ILCS 405/2-28(2) (West 2022) (noting that the most recent service plan must be disseminated in advance of a permanency hearing); 89 Ill. Adm. Code § 315.140 (eff. May 24, 2002). As such, we do not have the ability to adequately address this issue because the relevant evidence and transcripts are not present in the record. The respondent has the burden of presenting a sufficiently complete

record of the proceedings that would support his or her claims of error. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). In the absence of those records on appeal, we presume the order entered by the circuit court "was in conformity with the law and had a sufficient factual basis." *Id.* Any doubts regarding arising from the incomplete record are resolved against the respondent. *Id.* As there are no transcripts and virtually no other supporting documents from the permanency-review hearings, there is no basis for finding that respondent was never given her service plans. As such, the State's argument here that respondent's claim is forfeited is also well founded.

¶ 43     Finally, appellate counsel failed to file a reply brief and address any claim of plain error. Although forfeited issues may still be reviewed on appeal for plain error, a party who fails to argue for plain-error review in his or her opening or reply brief further forfeits any plain-error review by this court. *Moss*, 205 Ill. 2d at 168. As counsel failed to address plain error in the opening brief and a reply brief was not filed, review of this issue generally, and under the doctrine of plain error, is forfeited.

¶ 44                                B. Termination Determination

¶ 45     We next consider respondent's arguments that the circuit court erred in terminating her parental rights, where DCFS created a process that ignored the goals of the Act and the court failed to adequately and fairly assess the bond between respondent and K.R.M. Based on respondent's initial argument, it remains unclear if she is challenging the finding of unfitness, the best-interests finding, both, or some other constitutional claim. As to second claim, respondent fails to support many of her claims of error with citations to the record and legal analysis. In both instances, counsel fails to cite appropriate legal authority detailing the exact legal claim. As such, these arguments are also forfeited. See *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993) ("A reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive

arguments presented (134 Ill. 2d R. 341(e)(7) [eff. Oct. 1, 2020]), and it is not a repository into which an appellant may foist the burden of argument and research [citation]; it is neither the function nor the obligation of this court to act as an advocate or search the record for error [citation].”). Nonetheless, we reviewed both phases of the termination proceedings and conclude that the court's findings were not against the manifest weight of the evidence.

¶ 46                                    1. Finding of Unfitness

¶ 47    Regarding respondent's contentions of error, the circuit court's findings were not against the manifest weight of the evidence. A finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act. 750 ILCS 50/1(D) (West 2022); *In re D.D.*, 196 Ill. 2d 405, 422 (2001).

¶ 48    The Adoption Act provides that a court may find a parent unfit if the parent fails to make reasonable progress toward the reunification of the minor during any nine-month period following the adjudication of neglected or abused minor. 750 ILCS 50/1(D)(m)(ii) (West 2022). Under an objective standard, “reasonable progress” requires, at a minimum, the parent make measurable steps toward the goal of reunification through compliance with court directives, service plans, or both. *In re J.A.,* 316 Ill. App. 3d 553, 564-65 (2000). When assessing whether a parent substantially fulfilled his or her obligations under the service plans, “the court ‘must recogniz[e] that compliance with DCFS service plans is a means to a desired end, not the end in itself ***.’ ” *In re F.S.*, 322 Ill. App. 3d 486, 492 (2001) (quoting *In re S.J.,* 233 Ill. App. 3d 88, 120 (1992)).

¶ 49    During the nine months following K.R,M.'s adjudication of wardship, the relevant service plans required respondent to attend substance abuse counseling, domestic violence counseling, parenting classes and coaching, mental health evaluation and services, maintain stable housing and income, and attend supervised visitations with K.R.M. Respondent completed three out of seven

toxicology screenings and then failed to attended any toxicology screenings during the second rating period, attended the February 2020 family meeting, and completed the mental-health and domestic violence assessments; however, she did not seek the recommended treatment. Additionally, respondent was allowed weekly supervised visits and only exercised seven visits. She stopped seeing K.R.M. after July 15, 2020, and thereafter visits were suspended and were not reinstated until February 2022. Moreover, DCFS had reason to believe that respondent remained in a relationship with her abuser during this time (which was later confirmed, as respondent testified they broke up in September 2021), and, thus, the agency recommended that domestic violence concerns be addressed before addressing auxiliary services.

¶ 50    The record is replete with evidence that respondent did not make reasonable progress toward reunification until after the State petitioned to terminate her parental rights, and, even then, her progress was minimal. During her first nine-month period, she failed to complete most services noted in her service plan, and the services that respondent seemed to be making reasonable attempts to complete initially, were discontinued. Respondent's progress did not improve during the second nine-month period. Respondent takes issue with the fact that a termination hearing was not immediately set and that supervised visitation was reinstated after the petition to terminate was filed, however, we do not find this troubling. The termination hearing was either continued by agreement, on respondent's own motion, or because a permanency hearing was upcoming. The fact that the circuit court reinstated respondent's visitation after the petition to terminate was filed was an act of judicial kindness and does not persuade us that, contrary to the court's well-reasoned findings, it believed that respondent made reasonable progress.

¶ 51    Respondent also takes issue with DCFS's failure to advise Shankman that Sutton and, to a lesser extent, Reid believed that there was a bond between respondent and K.R.M. This

information was irrelevant to Shankman, as reunification was not the stated goal for her services. Shankman was utilized to help K.R.M. cope with reintroducing visitation and was not employed to improve respondent's bond with K.R.M. In fact, the agency's goals changed many months prior, as Shankman's services were sought over a year after the termination petition was filed. Accordingly, it was not error for DCFS to fail to inform Shankman of this extraneous information.

¶ 52    Next, respondent contends that DCFS and Arden Shore failed to comply with the court order from February 23, 2023, ordering a parent team assessment for respondent and K.R.M. and that DCFS pay for such assessment. This alleged transgression happened almost two years after the petition for termination was filed and is not relevant to the reasonable progress assessment, and, more importantly, DCFS was substantially impeded in providing such services by April 2023 when respondent's visitation was again suspended because she was in inpatient treatment. Moreover, there is no evidence in the record suggesting that DCFS refused to provide or pay for these services, even in the short period when visitation remained available. As such, this claim is also without merit.

¶ 53                                    2. Best-Interests Phase

¶ 54    Respondent contends that the circuit court erred because terminating her parental rights was not in K.R.M.'s best interests where the agency did not adequately assess the parent-child bond.

¶ 55    Section 1-3(4.05) of the Act (705 ILCS 405/1-3(4.05) (West 2022)) lists factors the court must consider when deciding whether termination of parental rights serves a child's best interests. The factors include the child's (1) physical safety and welfare; (2) the development of identity; (3) familial, cultural, and religious background; (4) sense of attachment, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) wishes; (6)

ties to his or her community; and (7) need for permanence, including her need for stability and continuity of relationships with parent figures and siblings. *Id.* § 1-3(4.05)(a)-(g). Additionally, the court must consider the uniqueness of every family and child, the risks related to substitute care, and the preferences of the person available to care for the child. *Id.* § 1-3(4.05)(h)-(j).

¶ 56    Respondent contends that the court's finding was against the manifest weight of the evidence because DCFS and Arden Shore failed to: provide a parenting assessment, inform Shankman about positive interactions between respondent and K.R.M., pay for services in violation of court order, consider Sutton's observations and report, and promote a relationship with respondent and K.R.M. Additionally, respondent alleges the court failed to compare respondent's positive parenting to the "red flags" apparent in the foster mother's parenting style. We find these claims unpersuasive.

¶ 57    Regarding respondent's initial claims of error, these claims have been addressed above and, for those same reasons, we believe that DCFS's failure to provide a parenting assessment or make respondent pay for such assessment and the agency's failure to inform Shankman about respondent's positive interactions with K.R.M. are immaterial.

¶ 58    Next, respondent contends that DCFS and the court failed to consider Reid's and Sutton's observations that respondent had a bond with her child. We find this claim belied by the record. Importantly, the court considered the bond that respondent forged with K.R.M. and the fact that multiple bonds were likely formed. Despite K.R.M.'s bond with respondent, the court considered the totality of the statutory factors and found that the issues respondent was facing and the limited permanency she could provide K.R.M. were outweighed by the permanency, attachment, and the bond K.R.M. had with her foster family. This was not unreasonable.

¶ 59    The respondent next claims that DCFS and Arden Shore failed to promote a relationship between herself and K.R.M. This claim is also belied by the record. Respondent had ample opportunities to attend services with the goal of reunifying with K.R.M.; however, as the court noted, respondent failed to take advantage of these services. Moreover, respondent had weekly supervised visits during her initial review period; however, she chose to attend only seven visits and, eventually, went without seeing K.R.M. for nineteen moths. This is not the fault of DCFS or Arden Shore. Respondent chose not to engage in services or to communicate with her caseworker, and she chose to forgo visitations (until they were suspended). As the court acknowledged, tools and services were made available for respondent, and she failed to engage in such services. Accordingly, respondent's argument here is meritless.

¶ 60    Finally, respondent claims that the court failed to consider her positive parenting against the "red flags" apparent in the foster mom's parenting style. Relevant to this consideration, the court determined that D'Andrea's testimony, which highlighted these "red flags," did not address the best-interests findings of K.R.M. regarding respondent's parental rights, rather it addressed the child's ultimate placement—a separate issue. It was not unreasonable for the court to give these "red flags" minimal weight because D'Andrea's testimony addressed an issue not before the court. Nonetheless, the court delved into D'Andrea's testimony and considered it evidence of a protective foster mother. The court's overall assessment of D'Andrea's testimony was that it did not indicate that placement with the foster mom was contrary to K.R.M.'s best interests. This finding is not unreasonable.

¶ 61    Overall, in addressing the best interests of K.R.M., the court noted that it was possible for the child to bond with more than one person—respondent and the foster mother. However, the court found that respondent knew that it was in K.R.M.'s best interests to remain with her foster

parents because they were able to "pick up the pieces," whereas respondent could not. The court emphasized that K.R.M.'s permanency was the prime concern, which respondent had not been able to prioritize because of domestic violence, substance abuse, and "the demons that have been chasing her." The court noted that respondent was concerned more about Renee M. than her own well-being or that of K.R.M. and that mindset was never treated with services because respondent avoided those services. Moreover, respondent was evaluated at Haymarket, and her use of alcohol was "out of control," her use of cocaine was "alarming," and just a month before its ruling respondent again tested positive for cocaine. The court stated that domestic violence and substance abuse have gone unchecked in respondent's life and her time to remedy the situation had run out. The record reasonably supports these findings.

¶ 62    The court also reasonably concluded that K.R.M. needed permanency and stability and she would not get that with respondent, but she had consistently gotten this with her foster family. K.R.M. was attached to her foster family, has continued affection, has a sense of identity there, and her placement with the foster family was the least destructive outcome. Regarding respondent's bond, the court found that it did not weigh K.R.M.'s refusal to attend visitations heavily, as she was only four years old; however, it considered this as evidence of less familiarity. In total, the court found that the State met its burden to show by a preponderance of the evidence that it was in the best interests of the child to terminate respondent's parental rights. The court's assessment was founded upon the relevant statutory factors and was not against the manifest weight of the evidence.

¶ 63                                III. CONCLUSION

¶ 64    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 65    Affirmed.